(Surrogate's Court, New York County. November 18, 1913.)

1. WILLS (§ 52*)—PROBATE—SANITY.
    Where it was shown that the testator was afflicted with insanity of a periodic nature, the proponent has the burden of proving that the will was executed during a lucid interval.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110; Dec. Dig. § 52.*]

2. WILLS (§ 34*)—PROBATE—SANITY.
    The legal test of sanity or competency to make a will is whether the acts of the testator correspond with his normal acts and conduct at a time he is conceded to have been of sound mind.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 71–73; Dec. Dig. § 34.*]

3. WILLS (§ 54*)—PROBATE—SANITY—EVIDENCE.
    To test the sanity or competency of testator, proof of his acts and conduct in great detail is admissible.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 131–134, 136; Dec. Dig. § 54.*]

4. WILLS (§ 34*)—PROBATE—SANITY.
    One of the legal tests of sanity or competency to make a will being whether the testator at the time of making reacts the common facts and events of his life, the fact that he is in such a mental condition that he needs medical attention will not necessarily render his will invalid.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 71–74; Dec. Dig. § 34.*]

5. WILLS (§ 55*)—PROBATE—CAPACITY.
    That an allographic will bears internal evidence of sanity does not establish capacity to make it.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. WILLS (§ 155*)—PROBATE—PROOF OF WILL.

A will hurriedly concocted by persons not acquainted with the testator, and when he is not in the hands of his friends, will be scrutinized more closely by the court than one executed under more normal circumstances.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

7. EXECUTORS AND ADMINISTRATORS (§ 74*)—OFFICE OF EXECUTOR.

An executor may be called the "eadem persona" of the testator, and occupies a position of highest responsibility.

[Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. § 74.*]

8. WILLS (§ 114*)—ATTESTING WITNESSES—PURPOSE.

Attesting witnesses to a will are required to see that there is no fraud committed on the testator, and that the act of testamentation is free and voluntary.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 277–279; Dec. Dig. § 114.*]

9. WILLS (§ 294*)—COMPETENCY—ATTESTING WITNESSES.

Because the act of testamentation is quasi public, attesting witnesses are competent to give their opinion upon the capacity of the testator and his freedom from restraint.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 679–684; Dec. Dig. § 294.*]

10. WILLS (§ 52*)—PROBATE—SANITY.

The burden of proof on the whole case is on the proponents of the will, where probate is contested on the ground of insanity.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110; Dec. Dig. § 52.*]

11. EVIDENCE (§ 553*)—OPINION EVIDENCE—HYPOTHETICAL QUESTIONS.

A hypothetical question should concisely state the facts on which the opinion of the expert is to be given, and it is improper to detail all the evidence introduced on the trial.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2369–2374; Dec. Dig. § 553.*]

12. EVIDENCE (§ 555*)—PROBATE—INSANITY.

Physicians who have examined one whose competency to execute a will is in controversy may state their opinion directly, without detailing the facts upon which the conclusion is based, leaving them to be brought out on cross-examination.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2376; Dec. Dig. § 555.*]

13. WILLS (§ 37*)—SANITY OF TESTATOR—PRESUMPTIONS.

When lucid intervals have to be computed by days and hours, courts should be strongly inclined on that ground alone to disbelieve in the restoration of the testator to a state of disposing capacity at the time of the execution of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 77; Dec. Dig. § 37.*]

14. COURTS (§ 89*)—PRECEDENTS—CIVIL-LAW PRECEDENTS.

Precedents from the civil law are binding on a court of probate in the absence of precedents from the common law.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 311, 312; Dec. Dig. § 89.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

15. WILLS (§ 52*)—PROBATE—BURDEN OF PROOF.
  The proponent of a will is bound to satisfy the conscience of a probate court that the will he propounds is that of a free and capable testator; and, if he fails, the court may then pronounce against the will.
  [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110; Dec. Dig. § 52.*]

16. COURTS (§ 198*)—PROBATE LAW.
  Probate law is a universal law, as a probate is a proceeding in rem.
  [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 469, 471–475, 478; Dec. Dig. § 198.*]

17. WILLS (§ 55*)—PROBATE—SANITY OF TESTATOR.
  In a proceeding for the probate of a will, evidence *held* insufficient to show the sanity of the testator.
  [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

In the matter of proving the last will and testament of John C. Martin, deceased. Probate denied.

Frederic H. Cowden, of New York City (Yorke Allen, of New York City, of counsel), for proponent.

Allen & Sabine, of New York City, for Fidelity Trust Company, legatee.

Thomas Carmody, Atty. Gen., intervening for indefinite beneficiaries.

James Cowden Meyers, of New York City, for contestants next of kin.

Graham & L'Amoreaux, of New York City, for contestant Wing.

Frederick W. Garvin, of New York City, for contestant College Board of Presbyterian Church in United States of America.

Parsons, Closson & McIlvaine, of New York City (Herbert Parsons, William E. Carnochan, and Edward C. Sperry, all of New York City, of counsel), for contestant Board of Home Missions of Presbyterian Church in United States of America and another.

Charles H. Beckett, of New York City, of counsel, for all contestants:

FOWLER, S. When this cause was heard before at the chambers of this court (80 Misc. Rep. 17, 141 N. Y. Supp. 784) it was held that the motion to consolidate the several proceedings for the probate of different paper writings, purporting to be the last will and testament of John C. Martin, deceased, was premature, and that such motion should be brought on before the surrogate presiding at the Trial Term of this court. When the matters accordingly came on again at the Trial Term, the surrogate decided that the later paper should be first proceeded on, and the other reserved, as in the event that the later paper was not established as a testamentary script, duly executed under the appropriate statute of wills, the devisees, legatees, and next of kin and heirs at law of John C. Martin, concerned in the earlier will only, would be relieved of much unnecessary litigation and expense. When the standing of those who may contest an earlier testamentary script depends solely on rights to be derived from the probate of a

later paper, the validity of the later paper, if at issue, must first be determined.    80 Misc. Rep. 27, 141 N. Y. Supp. 784.

This present proceeding is one for the probate of the paper writing, dated 31st of July, 1912, and alleged to be the last will and testament of John C. Martin, deceased, executed in due form of law.    The allegations or objections interposed to the probate state that the paper writing is not such last will and testament, and that on the date it purports to be executed John C. Martin lacked testamentary capacity and was unlawfully restrained and influenced in and about the testamentary act of execution.    The testimony produced by the parties on the trial was unusually extended, and the cause has been presented with the utmost precision, learning, and professional insistence—the briefs alone number some 650 pages—and yet the issue is a narrow one.    The matter might be very briefly decided, were it not for the fact that tradition and custom exact from the official presiding in courts of this character a somewhat extended review of the evidence, and the reasons for his application of legal principles, in order that the tribunals charged with the ultimate solution may be the more easily and better informed of the scope and incidents of the matter.

John C. Martin, the alleged testator, was a native of Pennsylvania, but at the time of his death he was a resident of this county of New York.    He had, in the course of his business career, been successful in coal mining ventures at Portage, in his native state, and at the time of his death had accumulated an estate conceded to be upwards of $750,000.    Mr. Martin died on the 3d of September, 1912, in about the sixty-seventh or eighth year of his age.    He was then a widower, and without children.    His next of kin and heirs at law consisted of a brother and seven sisters of the whole blood.

The paper now here for probate was executed at Portsmouth, in the state of New Hampshire, on the 31st day of July, 1912. Portsmouth was not Mr. Martin's home.    It appears that he had left Yonkers in this state, where he was on a visit to his sister, on July 5, 1912, intending to stop at the Hotel Champernowne at Kittery Point, on the coast of Maine.    He arrived there on the 6th day of July.    It was while he was summering on this part of the Maine coast that the Portsmouth will, now offered for probate, came into existence.    Portsmouth is within easy distance of Kittery Point, and Mr. Martin, during July, 1912, frequently visited Portsmouth.

[1] In the summer of 1910, Mr. Martin had been out of his mind, and for a time was actually confined and under medical restraint of some kind.    It is proved by contestants that from July to October, 1911, a similar mental malady, whatever it was, recurred, as it did beyond all controversy in some part of the summer of 1912.    Whether the last recurrence was before or after the making of the paper writing of 1912 is the great question.    That during several of these attacks Mr. Martin was insane is not really disputed in this cause, and it cannot be from the evidence.    But it is claimed by proponents, in substance, that the mental malady which affected Mr. Martin was of a periodic or acute kind, and that in the intervals between his acute attacks Mr. Martin was possessed of a sound and disposing mind.

Upon this issue it is incumbent on proponent to establish with particularity that testamentary capacity which is always involved in the legal act of testamentation.   Matter of Will of Gedney, 142 N. Y. Supp. 157.   In this particular case the ordinary presumption of sanity has little place for precise application, as it is demonstrated that at times in his life Mr. Martin was manifestly not possessed of a sane mind.

The medical evidence adduced on both sides discloses that Mr. Martin was afflicted with what is termed by the experts called to the stand "manic depressive insanity."   Manic depressive insanity was testified to be—

"that form of insanity which is characterized by a maniacal state, followed by a state of depression, or vice versa."

The depression it seems may precede the mania or follow it.   I infer from the medical testimony that depression of spirits, mania, and periodicity are features of this type or species—if species it can be termed—of mental derangement.   While the medical evidence adduced was very good of its kind, it failed to disclose to me the precise symptoms which distinguish "manic depressive insanity" from other forms of mental derangement.   Mania and depression are, I think, characteristic of many forms of insanity.   That "manic depressive insanity" is yet sufficiently specialized or differentiated from other types or forms of mental disorders I had some doubt on the trial, a doubt which is confirmed by my inability to find the word "manic" in either recognized works of science or recognized books of linguistic authority. "Manic" is evidently a Greek form, not sanctioned by English or Latin usage.   This shows that the disease itself is somewhat novel in classification, for scientists generally resort to the Greek for their new terminology.   The precise nature, duration, and extent of the malady affecting Mr. Martin is of the utmost importance upon the issue of his capacity to testamentate on the 31st of July, 1912.   If "manic depressive insanity" is an acute rather than a chronic mental disorder, his disorder did not necessarily incapacitate Mr. Martin at all times from making his will.   Manic depressive insanity was, I think, first differentiated by alienists of this country from other types of insanity in a much litigated and comparatively recent case in this state.   It was perhaps recognized before then by a German scientist.   Whether it is in fact invariably periodic and has a definite beginning and a definite ending I have some doubt from the medical testimony.

It has been often, I know, said by alienists that the law, in respect of its attitude toward the mentally irresponsible, has not kept pace with modern specialization and scientific development, and that the law lingers behind and is really in the century of Coke.   This criticism I do not regard as altogether justified, and I shall take the liberty, at the risk of invading the domain of other professions, of attempting to point out what I conceive to be the reason for the divergence of the two professions of law and medicine on an important question. The difficulty—and there is a difficulty—with the much to be desired rapprochement between jurisprudents and medical scientists is that each views "mens sana" from entirely different points of view.   The

pure alienist, or the modern medical man who specializes in what is termed "psychosis," or, in other words, in mental derangements, is concerned primarily with the diagnosis, treatment, and cure of mental disease. His diagnosis is based on elements more refined and subtle than the law always tolerates. He is admitted at present to be much affected in his process by psychology, which is the scientific exposition of mental phenomena. Now, as psychology is constructed only by the inductive method, from almost innumerable and varying phenomena, the so-called laws, discovered by psychologists, are regarded by the courts as very debatable. When medical scientists adopt the methods of the psychologists they are dealing in abstractions; too much so for the finite and practical purposes of jurisprudence, which, therefore, substitutes standards of its own. Psychology, like logic, is a formal science, and has no precise application to individuals. As logic has nothing to do with the truth of a particular proposition, but only with its correspondence to the formal laws of thought, so psychology has nothing to do with the correspondence of particular mental phenomena to the standards of sanity imposed by positive law. Positive law, on the other hand, has nothing to do with abstract generalities, but deals only with individual instances and individual capacities, which it determines by very simple tests.

[2] Before proceeding more definitely to a consideration of the facts established in this cause, I shall review briefly the tests which the law prescribes for legal competency or sanity. The legal test of sanity or competency—to some extent only convertible terms—is that the acts and conduct of the person whose sanity is under investigation shall correspond with normal acts and conduct. This does not mean, as was wisely held long ago by that very distinguished probate judge Sir H. Jenner Fust, in Mudway v. Croft (2 Notes Cas. in Ecc. Cts. 438), that such acts and conduct shall correspond with those of the average normal man, for no such man exists, but that the acts and conduct shown shall correspond with the acts and conduct of the subject himself at the time when he is proved or conceded to have been in health and of sound mind. Eccentricities, bad manners, and grotesque conduct, generally, are not evidence of insanity if they are normal to the man himself. An outrageously eccentric man may make a very good will.

[3, 4] It is because of the legal tests indicated that the law allows proof of acts and conduct of a testator in great detail. In this cause before me, the proofs of the acts and conduct of Mr. Martin are most voluminous and detailed. Another legal test of insanity is this: Is the testator shown to react to the common facts and events of his life (Matter of Will of Gedney, 142 N. Y. Supp. 157, 175)? These are very simple and practical tests of mental capacity. I have had occasion to observe before in other probate causes, where an allegation of incompetency or want of legal capacity was interposed, that the legal tests of insanity are simpler than the medical tests (In re Schmidt's Will, 139 N. Y. Supp. 464, 474, 483), and the reason for this is that while mental malady may be pronounced enough to need curative treatment, it may not be pronounced enough to denote legal incapacity.

The surrogate is not permitted in cases of this character to shelter himself from all responsibility by accepting the mere opinions of experts, without weighing them and subjecting them to the legal tests indicated. But this is a case so peculiar and subtle in character that the experts' testimony is very proper and helpful to the court. It is entitled to the greatest weight and consideration, for without it it would be almost impossible for the surrogate to arrive at correct conclusions, so delicate are the medical problems involved. And yet here it must be subjected to the tests which the law and the law alone prescribes for our action. It has been said, in substance, that unfortunately the physiological conceptions of the phenomena of insanity furnish us with no definite rule for our guidance, but the accepted physiological view of insanity is generally adverse to the practice of allowing testamentary efficacy to wills made during periods of doubtful sanity. This conclusion accords with the law.

Prior to the year 1910, Mr. Martin, when in health, is shown to have been a very industrious and excellent man of business. In his private life he was kindly and philanthropic, interested greatly in the Presbyterian Church and in works of charity, and in the religious education of the colored people. That Mr. Martin was somewhat boastful of his achievements in the business world, and in a harmless way fond of referring to them, is perhaps disclosed by the evidence. But this is not an uncommon characteristic of very sane men who owe their success to their own efforts. That Mr. Martin was possessed of a very moderate education is shown by his correspondence in evidence. But I am not satisfied that prior to 1910 the particular foibles, disclosed by the testimony, are of any legal importance to the real issue in this cause. Counsel for proponent have very skillfully and industriously massed much material bearing on Mr. Martin's early life, with a view to show that in times of his ill health and demonstrated mental maladies there was no great deviation from his usual habits, manners, and characteristics. In ordinary cases this kind of proof is often advantageous and important, but in this case the mental maladies of Mr. Martin were too pronounced to be explained away by the ordinary methods. This case must be determined by other principles, for Mr. Martin is proved at times to have been actually insane, or incapax in law, before the year he made his will. In view of that established fact the burden rests on proponent to satisfy me, by very clear evidence, that at the time the will in question was made Mr. Martin was again compos mentis, or, to speak more definitely, that he was of sufficient legal capacity to testamentate. There is in this case no room for a presumption of sanity after Mr. Martin's mental collapse of the year 1910.

In the summer of 1910 while at Atlantic City Mr. Martin had what proponent's leading counsel himself terms "a sudden attack of acute mania." That in the course of the summer of 1910 Mr. Martin did the most extraordinary things, that his conduct at times was violent, and that he was mentally irresponsible, is firmly established by the evidence. It is quite unnecessary for me to attempt to summarize the incidents and facts which establish this conclusion. On or about Au-

gust 5, 1910, his friends took Mr. Martin to Dr. Millspaugh's Sanatorium in Paterson, N. J., where he was confined until 4th of September following, when he was transported to Dr. Packer's Sanatorium at Riverdale, in New York. There he remained until 22d of September, 1910. That during the greater part of this time Mr. Martin was actually insane and incompetent to testamentate I am convinced from the evidence.

That during the sojourn of Mr. Martin in Europe in 1911 his extravagant actions and extraordinary conduct point at least to a recurrence of the pronounced disorder of 1910 I am satisfied by the proofs now before me. It would be impossible from the evidence on this point to come to any other conclusion. Indeed that Mr. Martin was, ever after 1910, restored to the sound physical condition of his earlier life is not, I think, fully established by the evidence. But that in the early part of the year 1912 he was conducting intelligently his own affairs and property until about the period of his final attack is, I think, established. The varied incidents of the year 1911 given in evidence are only important in connection with the medical evidence, and I will not stop to review them in detail. I will pass on to the consideration of the portions of the evidence which bear more directly on the act of testamentation at Portsmouth in the year 1912, the final year of Mr. Martin's life.

After July 6, 1912, until he was taken away to an asylum, or sanatorium, Mr. Martin was at the summer hotel at Kittery Point. The various inmates of the hotel have given in great detail their evidence of what he did and said while there. Most of these witnesses were, however, before this summer strangers to Mr. Martin, and their opinions have not the fullest weight. Certainly Mr. Martin's conduct between July 6th and 31st of the year 1912 was in many respects very peculiar and lacking in good taste. Whether it bears evidence of the incapacity which certainly soon followed is another question. The proponents introduced circumstantial evidence which they thought tended to break the force of the evidence of insanity, and to show that Mr. Martin was at this time sufficiently under the influence of liquor, to enable me to infer that the eccentricities and bad manners testified to may have been occasioned by drink, and were not due to any mental impairment. But as Mr. Martin was shown to be always a temperate man, and no witness at any time ever saw him drink to excess, or actually under the influence of liquor, I cannot infer from such circumstantial evidence alone that the rather gross eccentricities and conduct of Mr. Martin testified to by the witnesses were due solely to a bare possibility of drink. These particular incidents of eccentricity and folly are, however, most important according as they tend to corroborate or rebut the medical testimony given in evidence, or as they bear directly on the act of testamentation taking place on the 31st of July, 1912. That eight days after the 31st of July, 1912, Mr. Martin was insane the evidence conclusively demonstrated. During this last severe attack Mr. Martin died. The real question remains, Was Mr. Martin sufficiently sane in law to make his will on the 31st of July, 1912?

[5] The stupendous mass of evidence now before me is all ad⊥

dressed to that one narrow, definite and great question. This evidence has been exhaustively and laboriously presented and its legal effect argued by counsel in this case with the utmost ingenuity, learning and skill. That the will on its face bears internal evidence of rationality is not enough. The mere fact that an allographic will bears internal evidence of sanity does not establish capacity to make it. I know of but one authoritative case, not cited to me (Cartwright v. Cartwright, 1 Phillimore's Ecc. Reports, 90), where a will was held to afford internal evidence of sanity, and that was a holograph. Now, a holograph is a declaration which may be given in evidence on an issue of sanity. The logic of the adjudication in Cartwright v. Cartwright in any respect has been criticized, and I think justly, for the will in that instance was allowed to prove sanity, and, sanity being thus established the will was held valid. This is an example of the logical fallacy called circle in the proof, "circulando in probando."

[6] The circumstances and occasion of an act of testamentation are the turning point of an issue of this kind. A deathbed will, hurriedly concocted, should always be scrutinized in courts of this character; so a sudden will of persons concededly subject to mental paroxysms, if made when away from home and among total strangers, is not on the plane of a will executed at home in the presence of well-known witnesses and a respectable and trusted family or neighboring lawyer who has possessed for years the acquaintance and confidence of the testator. A will executed suddenly and for no reason away from home, if drawn by strangers and attested by strangers, certainly requires, if challenged, clearer proofs to prevail than one executed with deliberation in the ordinary domestic and familiar surroundings. And this is a fortiori so when the particular testator is shown to have been at times violently insane and very soon after the act of will lapses into a state concededly insane, from which he never recovers. It is true that in this case now here Mr. Martin was so fortunate as to fall into the hands of a kindly and thoroughly respectable lawyer of Portsmouth. That this lawyer was entirely circumspect, considering the greatness of the estate involved and the fact that the testator was a stranger, may be doubted. It is established by the evidence that Mr. Martin suddenly disposed of a large estate, while temporarily away from home, and that the professional man employed to prepare it was an utter stranger to testator, while the witnesses employed were even more strange to him. These facts are sufficient, in themselves, to entitle the contestants' objections to the probate to the most careful consideration of the surrogate.

The will now offered for probate, it will be observed, makes the lawyer who drew it one of its executors, and prima facie entitles him to the custody of a very large estate. It is under the circumstances incumbent on the executor as proponent to establish in this proceeding by the clearest proofs that the testator was, at the time he made the paper propounded, in every way capable of making it. To entitle the paper to probate there must be no doubt on that score. The proponent contends that testator's final attack of mania was acute, and began not before August 8, 1912, or some eight days after the making of the

will in question. On August 8, it is clear from the proofs, Mr. Martin manifested openly, at a formal public meeting, an utter want of mental balance. That his mind was then permanently unseated was testified to by several of the medical experts, and during this continued attack he died. The real question is, Was Mr. Martin of sound and disposing mind eight days before the pronounced attack, or when the paper propounded was made? It will be observed that in any aspect of the proofs the proponent has here a very narrow margin of safety, and only eight days from a questioned capacity to pronounced madness. So narrow is this margin of safety that if contestants are able to move the manifest insanity back even one day, that accomplishment tends to destroy the integrity of the theory of this case submitted for proponent.

Now, what are the facts as to August 7th, the very day before the practically conceded mental breakdown of Mr. Martin? The sayings and doings of Mr. Martin on August 7th, and even earlier in August, have been chronicled by the witnesses. His conduct at the Greenacre Inn, for example, and his declarations on the date mentioned certainly are so abnormal as to tend at least to confirm the opinion of the expert, Dr. Pou, who placed the beginning of Mr. Martin's last mental collapse as of a date anterior to the making of the will of July 31st. If contestants have raised a doubt as to the sanity of Mr. Martin on the 7th of August, the day before the more marked breakdown, how far back does the influence of this doubt extend, and particularly does it extend to a date prior to the 31st of July, 1912? This is an important consideration for the surrogate.

On the part of proponent a number of witnesses residing in and about Portsmouth testified, as lay witnesses may do, to the apparent rationality of Mr. Martin about the time of the act of testamentation. These witnesses were all persons of intelligence and the highest respectability. But their acquaintance with Mr. Martin was very sudden and brief. It is in evidence that Mr. Martin's manner at almost all times was genial, democratic, and engaging. During his brief stay Mr. Martin professed a rather too exuberant interest in the general prosperity of Portsmouth; and, as according to himself, and in point of fact, he was rich, generous, charitably disposed, and able to be of the greatest local and private benefit, the neighborhood evidently were inclined to take a very favorable view of the eccentric Mr. Martin. Mr. Martin in his normal days was, I judge, something of an actor, and even his quiet attitudes were of a quality somewhat striking. This quality never forsook him, and he evidently impressed himself on the neighborhood of Portsmouth very quickly and favorably. Apparently Mr. Martin stood ready, during his brief sojourn in or near Portsmouth, to buy anything in sight, or if not to buy, to promote and benefit in the most unselfish way the local interests called to his attention. Could anything be better calculated to excite the sympathy of a long-settled, quiet, respectable neighborhood than the sudden visit of a wholly disinterested, religious man of great wealth like Mr. Martin? But as the extraordinary visitation of Mr. Martin to Portsmouth neighborhood embraced not quite five weeks in all, the opinions of the

lay residents of that locality as to his sanity must give way in force and value in this instance to that of the many more intimate lay witnesses and medical scientists called to the stand. The value of the opinion of lay witnesses in cases of this kind varies and depends primarily, as it should, upon their opportunities for forming an opinion of value. Now, Mr. Martin's mental malady was according to the experts one of a very subtle kind. Its manifestations, prognosis, and effects on rationality of the testator could hardly be appreciated, I think, by the most astute of the casual lay acquaintances whom Mr. Martin encountered during his holiday of barely five weeks' duration on the contiguous shores of Maine and New Hampshire.

It has been intimated before that from the medical evidence the manifestations of manic depressive insanity are very subtle and to some extent indefinable. Its subject may be in the incipient stages of the disease before lay witnesses perceive it. Postulating this, let us proceed to an examination of the evidence bearing directly on the Portsmouth will. Mr. Martin had arrived at Kittery Point on the 6th day of July, 1912. On July 29th following he was referred by a strange dentist of Portsmouth, who had casually attended him on several prior occasions, to Col. Bartlett, a lawyer of Portsmouth, having his office downstairs from the dentist's chambers. On the following day, Col. Bartlett, who had never, I think, met Mr. Martin before the 29th of July, must have prepared the testamentary paper executed the next day, and now proceeded on in this court. This paper purports to dispose of a very large estate, and it names its draftsman as one of the executors of Col. Martin.

[7] If valid this paper will carry to the executor the custody, control, and possession of a large estate, and the right to charge the estate with the vast expenses incurred in this litigation. In law an executor has been called "eadem persona" as the testator, because the clothing and fortune of the testator devolve on the executor for all juridical purposes. An executorship is always a position of trust and confidence, and one, I think, avoided generally by most men of the highest responsibility, unless some affectionate or family relationship peremptorily dictates an acceptance to be a duty.

The attesting witnesses to the paper propounded were all strangers to Col. Martin and residents of Portsmouth. One of them, Miss Emily Stavers, was employed as a stenographer in the law office of Col. Bartlett. The second witness, Miss Helen M. Quinn, pursued a like occupation in the office of another lawyer of Portsmouth. The third attesting witness was the Portsmouth dentist, who, as stated, had on several prior occasions attended Mr. Martin in the dental rooms up the stairway from Col. Bartlett's office. Miss Stavers had never seen Mr. Martin before July 29, 1912, and Miss Quinn had never met him before the very moment of the assembling for the execution of the will. Their opportunities of forming an opinion upon Mr. Martin's capacity to make a will were therefore most limited. These witnesses so attesting the will were no doubt acting in entire good faith. They were natives of that part of the country, and their refined demeanor and their frank evidence is entitled to the consideration which of right

attaches to a long and respectable habitancy of an old, cultivated, and well-ordered community of New England.

[8] Attesting witnesses to a will are placed there for the purpose of seeing that no fraud is committed on testator, and that the act of testamentation is testator's free and voluntary act, and that he duly executes the will. The statute of wills prescribes with particularity what the witnesses must do in order to complete and validate an act of testamentation. Lewis v. Lewis, 11 N. Y. 220.

[9] Because the act of testamentation is a quasi public act, attesting witnesses, contrary to the general rule of law, may give their opinion upon the capacity of the testator to testamentate and his freedom from restraint. Such judgment is part of their function. In Re Foley's Will, 76 Misc. Rep. 168, 136 N. Y. Supp. 933, 936, in Re Schmidt's Will, 139 N. Y. Supp. 464, 477, and again in Re Van Ness' Will, 78 Misc. Rep. 592, 139 N. Y. Supp. 485, 513, I was at some pains to consider the legal theory concerning the duties and responsibilities of witnesses to an act of testamentation taken under the present statute of wills. Where attesting witnesses are sufficiently acquainted with a testator, their testimony on his capacity to make a will is even said, in some modern cases in this state, to alter the old and established rule of probate courts concerning the burden of proof; the entire presumption being for the will. Whether this dictum is well founded or not, no adjudication of weight attaches, as I think, importance to the opinion of attesting witnesses on a subject with which they can have no acquaintance whatever, and that is this case.

[10] If we cannot rely in this case on the testimony of the attesting witnesses concerning the sanity and competency of Mr. John C. Martin on the 31st of July, 1913, the evidence of that fact, so essential to probate, must depend on other witnesses called by proponent. The inherently light weight of the testimony of Mr. Martin's summer acquaintances has been already noticed. But if we give greater weight to this lay opinion—evidence on insanity—it is offset by evidence of the same character given in by contestants, so as not to preponderate in the favor of proponent. This is a case where the mass of evidence is so great as to make it difficult to see the woods through the trees, but I am clear that there is no such preponderance. On an issue of sanity the burden is on the proponents (see citations in Re Gedney's Will, 142 N. Y. Supp. 157). Before the late and very explicit decision of the Court of Appeals in Matter of Will of Kindberg, 207 N. Y. 221, 100 N. E. 789, I had been of the opinion of Mr. Surrogate Rollins, that the burden of proof rested always by probate law on a proponent of a will, for the reasons stated by me in Matter of Falabella, 139 N. Y. Supp. 1003. On an issue of sanity I am still of the opinion that it remains on the whole case on proponents in a court of probate, for the reasons stated by me again in Re Gedney's Will, 142 N. Y. Supp. 157. I can add nothing to the citations of authority there presented. In this cause at bar sanity or testator's capacity is the main, if not the sole, issue, and onus probandi sanity on the whole case rests on the proponent.

[11] As I cannot find from the evidence of the lay witnesses any preponderance of proof in favor of proponent on the main issue, let us turn next to the medical evidence in the cause, premising there are two kinds of medical testimony in the record. There is the testimony of physicians who saw personally and actually examined and treated professionally Mr. Martin for disease of the brain, and there is the evidence of one medical gentleman who testifies not from his observation of Mr. Martin, but to an opinion, based on a hypothesis put to him. The hypothetical question in this cause seemed to me to be well framed. But I exercised the prerogative of a trial judge in requiring the question to be more concisely framed than was originally contemplated by counsel. I did this with great reluctance, not only on account of the eminence of counsel, but because I desire never to interfere unduly in the trial of a cause. But I have but little patience with hypothetical questions detailing all the evidence in a cause and asking the expert in effect what he thinks of it. A question so framed may, as in a Texas case, require weeks to propound. Such a detailed question so framed is, to my mind, an obstruction to justice, and finds no warrant in the jurisprudence of any other civilized country. The adjudications of this state do not, I think, hold, that all the facts established in a cause must be embraced in a hypothetical question in order to render it unobjectionable or valid. I make this explanation in order that my attitude on the trial may, in this respect, be better understood by counsel. To my mind, the more concisely a hypothetical question is put to an expert the better the result and the safer the method. It was, I think, the opinion of the great Chief Justice Shaw, that the question might be thus put: If the following facts (detailing them very briefly) should be found true by the jury, what would be your opinion on the question of soundness of mind of the testator (Woodbury v. Obear, 7 Gray [Mass.] 467)? If the facts predicated of the expert opinion are not found by the trier of fact, of course the answer is worthless. Therefore only the salient and important facts should ever be embraced in the hypothetical question. In detailing in the question all the evidence introduced on the trial, there is great danger that the jury, or other trier of fact, may not find some of the controverted details to be established by the evidence. In that event the question is not well put, and the opinion is technically worthless. In this cause I think the hypothetical question was well put, and the opinions of the experts are entitled to weight as proper evidence.

[12] In this state, in any event, physicians who have examined one whose competency is sub judice may state their opinion of his sanity directly, without detailing the facts on which the conclusion is based, leaving such facts to be brought out by the cross-examiner. People v. Faber, 199 N. Y. 256, 92 N. E. 674, 20 Ann. Cas. 879; Weibert v. Hanan, 202 N. Y. 328, 95 N. E. 688; People v. Youngs, 151 N. Y. 210, 45 N. E. 460. In other words, the opinions of physicians called to the stand may be the result of their personal examination of the patients, or it may be based on symptoms, or acts and conduct, detailed in a hypothetical question put to them. The four or five experts and attending physicians called to the stand by contestants testified that

from both personal examination of Mr. Martin and from the facts stated in the hypothesis put to them Mr. Martin was insane on or before the 31st of July, 1912. Dr. Pou testified in substance that from his examination alone of Mr. Martin he was able to state, without regarding the facts and conduct detailed in the hypothetical question, that Mr. Martin was insane on the 31st of July, 1912. The proponent called but one physician, Dr. Jeliffe, who had never seen Mr. Martin. On the hypothesis put to this gentleman he testified that Mr. Martin's manic depressive insanity began on August 8, 1912, or after the making of the Portsmouth will, and that on the date of the will Mr. Martin was sane. The weight of the medical evidence, notwithstanding Dr. Jeliffe's testimony, is not on the side of proponent, as it should be in this proceeding.

But there is another difficulty with proponents' case on the paper. "Manic depressive insanity," as I judge from the medical evidence, may eclipse reason altogether, or it may impair it so as to incapacitate its victim at times only. It will be perceived that intermittent or partial insanity is always a difficult case for the law to deal with, for it may or may not so extensively impair the mind as to legally incapacitate one partially insane, except perhaps during periods of actual frenzy or mania. The varying character of manic depressive insanity accounts, no doubt, for some of the discrepancies apparent in the testimony of the lay witnesses. There are, for instance, facts and conduct, proven by proponent, which tend to establish per se a certain apparent rationality of Mr. Martin about July 31, 1912, when the will in question was made. But, in view of the medical evidence, that is not enough in this case. Where a particular sanity is concededly intermittent, fluctuating and variable, the burden is on the proponent very strongly to establish testamentary capacity at the very moment of the act of testamentation. I have shown how inadequate and defective or infirm on this point the evidence of the strangers who were attesting witnesses to the will necessarily is from the very nature of things. The experts have, on the other hand, stated on oath that in their opinions on the 31st of July, 1912, the date of the will, Mr. Martin was actually insane. To be insane, in probate law, imports an absence of will, and as a last testamentary paper is only the final expression of its maker's will, if a testator possesses no will, it is apparent that he cannot express a last will. He has none to express.

[13, 14] In countries where the civil law obtains it is claimed that there is observable a greater refinement than is common with us in cases involving legal capacity. It is claimed in civil-law countries that the decisions in common-law countries are on the subject of legal capacity "variant and discordant," and I fear it is so. In civil-law countries it is generally held that the proof of legal capacity in cases of partial insanity is extremely difficult, and that when lucid intervals have to be computed by days and hours courts should be strongly inclined on that ground alone to disbelieve in the restoration of the patient to a state of disposing capacity. In common-law countries this is nowhere so clearly stated. As this is the first case, I think, in this state on a will made by one proven to be afflicted with the intermittent

type of insanity, now known as "manic depressive insanity," there is in existence no authority for this very case, and when that is the fact the civil-law rule becomes in this court, in the absence of all other authority, extremely cogent. In re Van Ness' Will, 78 Misc. Rep. 592, 139 N. Y. Supp. 493; In re Swartz's Will, 79 Misc. Rep. 388, 139. N. Y. Supp. 1113.

[15] But I will not rest my judgment in this cause on a rule taken from the civilians. There is a well-established principle of that probate law which is part of the common law of this state, and this principle I think is determinative here. I refer to the rule requiring a proponent of a will to satisfy the conscience of a probate court that the will he propounds is the will of a free and capable testator. If proponent fail so to satisfy the conscience of the court, the court may then pronounce against the will. This was a well-established canon of the probate law, which, as a part of the common law, became the fundamental law of this state by constitutional reservation, and I have never been able to put my hand on an express and clearly pronounced adjudication in this state changing this old and established principle of testamentary law. Indeed, I find the principle tacitly recognized in cases of late authority in this jurisdiction. Howland v. Taylor, 53 N. Y. 627; Rollwagen v. Rollwagen, 63 N. Y. 517; Matter of Cottrell, 95 N. Y. 336. It has been said by a probate judge of recognized learning that section 2622, Code of Civil Procedure, was intended to confirm the very principle last indicated (Cooper v. Benedict, 3 Dem. Sur. 136), and it may be so. I will assume that it is. While I have never been sure in my own mind that section 2622, C. C. P., was in its origin entitled to such an extensive interpretation as that accorded it, I have been quite willing to follow the decision cited in the interest of a definite jurisprudence. In re Van Den Heuvel's Will, 76 Misc. Rep. 137, 136 N. Y. Supp. 1125. It is highly essential in this state that our probate law should be in accord, if possible, with the general law and consensus of Christendom on the same general propositions of probate law.

[16] Probate law is a universal law, as a probate is a proceeding in rem. It is not in the interest of the public that plausible local deviations should be substituted for ancient and established rules of probate law, unless such a course is imperative and very authoritative.

It must be conceded, I think, that there is a line of adjudications in this state which tend to hold that after the factum of will is established by the attesting witnesses the burden of proof on the whole case is on contestants, and that all the surrogate has then to do in a probate cause is to weigh the evidence, and if the contestants' proofs do not weigh more than the proponents' the decree of probate must issue as of course. This line of adjudications is, I think, inconsistent with such adjudications as those before cited in this opinion, and I venture to believe such adjudications as those first mentioned do not settle the law adversely to what I have before stated to be the rule in probate jurisdictions controlled by the common law. In other words, the decisions referred to do not hold, that because there is on the whole case doubt on the testator's capacity to testamentate the surrogate must

nevertheless admit a will to probate if the attesting witnesses have testified to the sanity and competency of the testator at the moment of executing the will. That express point I have never yet seen stated so definitely in our reports as to make it binding on me in this cause. It is a great pity that there is any vagueness of doctrine on points so essential to the public security. As the great Lord Hardwicke well said, "Misera est servitus ubi jus vagum."

[17] In view of the almost uncontroverted expert testimony that Mr. Martin was insane on the 31st of July, 1912, a condition of the proofs is presented which makes me not satisfied (giving due weight to proponent's proofs to the contrary) that Mr. Martin was on 31st of July, 1912, of competent capacity to make a will. For this reason, and I hold this reason to be sufficient in probate law (In re Van Ness' Will, 78 Misc. Rep. 592, 139 N. Y. Supp. 521; In re Jacobs' Will, 76 Misc. Rep. 394, 137 N. Y. Supp. 161; In re Van Den Heuvel's Will, 76 Misc. Rep. 137, 136 N. Y. Supp. 1125), probate of the paper propounded is refused. Settle decree accordingly.