Bernard S. Meyer, J.
The relationship of psychiatry to the criminal law has been the subject of study and recommendation by the Temporary Commission on Revision of the Penal Law and Criminal Code (Leg. Doe. [1963], No. 8, pp. 16-26). This court had reason to touch upon the relationship of psychiatry *213 to matrimonial law in Anonymous v. Anonymous (37 Misc 2d 773). The instant case presents yet a third aspect of the same basic problem: that involving the law of contract.
Plaintiff herein seeks rescission of a contract for the purchase of vacant land in Long Beach on the ground that he was not at the time the contract was entered into of sufficient mental competence. Defendant counterclaims for specific performance.
The evidence demonstrates that from April until July, 1961, plaintiff was in the depressed phase of a manic-depressive psychosis and that from August until the end of October he was in the manic stage. Though under care of Dr. Levine, a psychiatrist, beginning June 8 for his depression, he cancelled his August 8 appointment and refused to see the doctor further. Previously frugal and cautious, he became more expansive beginning in August, began to drive at high speeds, to take his wife out to dinner, to be sexually more active and to discuss his prowess with others. In a short period of time, he purchased three expensive cars for himself, his son and his daughter, began to discuss converting his Long Beach bathhouse and garage property into a 12-story co-operative and put up a sign to that effect, and to discuss the purchase of land in Brentwood for the erection of houses. In September, against the advice of his lawyer, he contracted for land at "White Lake in the Catskills costing $11,500 and gave a $500 deposit on acreage, the price of which was $41,000 and talked about erecting a 400-room hotel with marina and golf course on the land.
On September 16, 1961, he discussed with Mr. Kass, defendant’s president, the purchase of the property involved in this litigation for the erection of a discount drugstore and merchandise mart. During the following week Kass advised plaintiff that defendant would sell. On the morning of Saturday, September 23, plaintiff and Kass met at the office of defendant’s real estate broker. Kass asked $55,000, plaintiff offered $50,000; when the broker agreed to take $1,500 commission, Kass offered to sell for $51,500 and plaintiff accepted. It was agreed the parties would meet for contract that afternoon. Kass obtained the services of attorney Nathan Suskin who drew the contract prior to the 2:00 p.m. conference. Plaintiff returned to that conference with his lawyer (who is also his brother-in-law) who approved the contract as to form but asked plaintiff how he would finance it and also demanded that the contract include as a condition that a nearby vacant property would be occupied by Bohaclc. No mention was made of plaintiff’s illness. When Suskin refused to consider such a condition, plaintiff’s lawyer withdrew. The contract was signed in the absence of plaintiff’s *214 lawyer and the $5,150 deposit paid by check on plaintiff’s checking account in a Rockaway bank.
On the following Monday morning, plaintiff transferred funds from his Long Beach bank account to cover the check. On the same day, he went to Jamaica and arranged with a title abstract company for the necessary search and policy, giving correct details concerning the property, price and his brother-in-law’s address and phone number and asking that search be completed within one week. Between September 23 when the contract was signed and October 8 when plaintiff was sent to a mental institution, he persuaded Leonard Cohen, a former employee, to join in the building enterprise promising him a salary of $150 a week and a Lincoln Continental when the project was complete, caused a sign to be erected on the premises stating that ‘ ‘ Faber Drug Company ” and a “ merchandise mart ” were coming soon, hired an architect, initiated a mortgage application giving correct details as to price and property dimensions, hired laborers to begin digging (though title was not to close until Oct. 20), filed plans with city officials and when told by them that State Labor Department approval was required, insisted on driving to Albany with the architect and Leonard Cohen to obtain the necessary approval.
On September 25 plaintiff saw Dr. Levine as a result of plaintiff’s complaint that his wife needed help, that she was stopping him from doing what he wanted to. He was seen again on September 26 and 28, October 2 and October 8, and hospitalized on October 8 after he had purchased a hunting gun. Dr. Levine, Dr. Sutton, who appeared for defendant, and the hospital all agree in a diagnosis of manic-depressive psychosis. Dr. Levine testified that on September 23 plaintiff was incapable of reasoned judgment; the hospital record shows that on October 9, Dr. Krinsky found plaintiff’s knowledge good, his memory and comprehension fair, his insight lacking and his judgment defective. Dr. Sutton’s opinion, based on the hospital record and testimony of plaintiff’s wife and Dr. Levine, was that plaintiff was subject to mood swings, but that there was no abnormality in his thinking, that his judgment on September 23 was intact.
The contract of a mental incompetent is voidable at the election of the incompetent (Blinn v. Schwarz, 177 N. Y. 252) and if the other party can be restored to status quo rescission will be decreed upon a showing of incompetence without more (Verstandig v. Schlaffer, 296 N. Y. 62; see Church v. Dreier, 205 App. Div. 820). If the status quo cannot be restored and the other party to the contract was ignorant of the incompetence *215 and the transaction was fair and reasonable, rescission will, however, be denied notwithstanding incompetence (Mutual Life Ins. Co. v. Hunt, 79 N. Y. 541, 545; see Riggs v. American Tract Soc., 84 N. Y. 330, 337). The burden of proving incompetence is upon the party alleging it, but once incompetence has been shown, the burden of proving lack of knowledge and fairness is upon the party asking that the transaction be enforced (Merritt v. Merritt, 43 App. Div. 68, 70; Aikens v. Roberts, 164 N. Y. S. 502; Beale v. Gibaud, 15 F. Supp. 1020, 1028). In the instant case the contract concerns vacant land and is executory and though plaintiff caused some digging to be done on the premises, the proof shows that the land has been levelled again. Clearly, the status quo can be restored and plaintiff is, therefore, entitled to rescission if the condition described meets the legal test of incompetence.
The standards by which competence to contract is measured were, apparently, developed without relation to the effects of particular mental diseases or disorders and prior to recognition of manic-depressive psychosis as a distinct form of mental illness (Matter of Martin, 82 Misc. 574, 578). Primarily they are concerned with capacity to understand: (Aldrich v. Bailey, 132 N. Y. 85, 87-88) “ so deprived of his mental faculties as to be wholly, absolutely and completely unable to understand or comprehend the nature of the transaction ”; (Paine v. Aldrich, 133 N. Y. 544, 546) “ such mental capacity at the time of the execution of the deed that he could collect in his mind without prompting, all the elements of the transaction and retain them for a sufficient length of time to perceive their obvious relations to each other, and to form a rational judgment in regard to them”; (Matter of Delinousha v. National Biscuit Co., 248 N. Y. 93, 95) “A contract may be avoided only if a party is so affected as to be unable to see things in their true relations and to form correct conclusions in regard thereto ”. (See, also, Aikens v. Roberts, supra, p. 504; Morse v. Miller, 39 N. Y. S. 2d 815, 818, affd. 267 App. Div. 801; Martin v. Teachers’ Retirement Bd., 70 N. Y. S. 2d 593, 594.) If cognitive capacity is the sole criterion used, the manic must be held competent (Lovell v. Keller, 146 Misc. 100; Beale v. Gibaud, supra; cf. Matter of Martin, supra), for manic-depressive psychosis affects motivation rather than ability to understand.
The law does, however, recognize stages of incompetence other than total lack of understanding. Thus it will invalidate a transaction when a contracting party is suffering from delusions if there is “ some such connection between the insane delusions and the making of the deed as will compel the infer *216 ence that the insanity induced the grantor to perfqrm an act, the purport and effect of which he could not understand, and which he would not have performed if thoroughly sane ” (Moritz v. Moritz, 153 App. Div. 147, 152, affd. 211 N. Y. 580, see Beisman v. New York City Employees’ Retirement System, 275 App. Div. 836, affd. 300 N. Y. 580). Moreover, it holds that understanding of the physical nature and consequences of an act of suicide does not render the suicide voluntary within the meaning of a life insurance contract if the insured ‘1 acted under the control of an insane impulse caused by disease, and derangement of his intellect, which deprived him of the capacity of governing his own conduct in accordance with reason.” (Newton v. Mutual Benefit Life Ins. Co., 76 N. Y. 426, 429; Van Zandt v. Mutual Benefit Life Ins. Co., 55 N. Y. 169.) Finally, Paine v. Aldrich (supra) and the Delinousha case consider not only ability to understand but also capacity to form “ a rational judgment ” or “ correct conclusions.” Thus, capacity to understand is not, in fact, the sole criterion. Incompetence to contract also exists when a contract is entered into under the compulsion of a mental disease or disorder but for which the contract would not have been made.
Whether under the latter test a manic will be held incompetent to enter into a particular contract will depend upon an evaluation of (1) testimony of the claimed incompetent, (2) testimony of psychiatrists, and (3) the behavior of the claimed incompetent as detailed in the testimony of others (Green, Judicial Tests of Mental Incompetency, 6 Mo. L. R. 141), including whether by usual business standards the transaction is normal or fair (Green, Proof of Mental Incompetency and the Unexpressed Major Premise, 53 Yale L. J. 271, 299-305). Testimony of the claimed incompetent often is not available, and in any event is subject to the weakness of his mental disorder, on the one hand, and of his self-interest on the other. The psychiatrist in presenting his opinion is, in final analysis, evaluating factual information rather than medical data, and is working largely with the same evidence presented to the court by the other witnesses in the action (Leifer, Competence of the Psychiatrist to Assist In the Determination of Incompetency, 14 Syracuse L. R. 564). Moreover, in the great majority of cases psychiatrists of equal qualification and experience will reach diametrically opposed conclusions on the same behavioral evidence. The courts have, therefore, tended to give less weight to expert testimony than to objective behavioral evidence (Halpern, Civil Insanity: The New York Treatment of the Issue *217 of Mental Incapacity in Non-Criminal Cases, 44 Corn. L. Q. 76; Green, op. cit., 53 Yale L. J., p. 306).
In the instant case, plaintiff did not testify at the trial but his examination before trial was read into the record. It shows that he understood the transaction in which he was engaged, but throws no light on his motivation. Plaintiff introduced no evidence concerning the rationality or fairness of the transaction (in the apparent belief that Merritt v. Merritt, 43 App. Div. 68, supra, applied and that such proof, therefore, was not part of his case) so the court has no basis for comparison in that respect. Plaintiff’s evidence concerning the location of the property and the nature of the business he proposed to carry on there fell short of establishing irrationality, nor can it be said that the making of an all cash contract was abnormal, even if the two earlier White Lake dealings are considered, in view of the testimony of plaintiff and his wife that the Long Beach bathhouse property was worth $200,000 and that it was free and clear. But the rapidity with which plaintiff moved to obtain an architect and plans, hire laborers, begin digging on the property, and his journey to Albany to obtain building approval, all prior to title closing, are abnormal acts. Viewing those acts in the context of his actions, detailed above, with respect to the White Lake properties, his plans with respect to the Brentwood property and the conversion of his bathhouse premises, and his complaint to Dr. Levine on September 25 that his wife was in need of help because she was trying to hold him back, the court is convinced that the contract in question was entered into under the compulsion of plaintiff’s psychosis. That conclusion is contrary to the opinion expressed by Dr. Sutton, but the court concludes that Doctors Levine and Krinsky as treating physicians had the better basis for the opinions they expressed. In any event their opinions are but confirmatory of the conclusion reached by the court on the basis of the evidence above detailed.
Defendant argues, however, that the contract was ratified by the acts of plaintiff’s attorney in forwarding a title objection sheet to defendant’s attorney and in postponing the closing and by plaintiff himself. Ratification requires conscious action on the part of the party to be charged. Plaintiff was still in the mental hospital when the objection sheet was sent and the closing date postponed and these acts have not been shown to have been carried out with his knowledge or by his direction. As for his own action it was merely to answer, in reply to an inquiry from defendant’s president as to when he was going to take title, that he did not know, it was up to his attorney. *218 The contract with defendant had been signed on September 23, plaintiff had been sent to the hospital on October 8 and remained there until November 11, having a series of electro-shock treatments while there, and the complaint in this action was verified November 20. The conversation with defendant’s president could not have occurred until after November 11 and must have occurred several days prior to November 20. An answer as equivocal in nature and made under the circumstances as the one under consideration cannot in any fair sense be characterized as an exercise of plaintiff’s right of election to “ hold on to the bargain if it is good and let it go if it is bad ” (Blinn v. Schwarz, 177 N. Y. 252, 263, supra).
Accordingly, defendant’s motions at the end of plaintiff’s case and of the whole case, on which decision was reserved, are now denied, and judgment will be entered declaring the contract rescinded and dismissing the counterclaim. The foregoing constitutes the decision of the court pursuant to section 440 of the Civil Practice Act.
During trial motions were granted amending the title of the action to read “ Isidore Faber by Esther Faber, his guardian ad litem, plaintiff, v. Sweet Style Manufacturing Corporation, successor by merger to Semel Realty Corp., defendant.” The judgment to be settled hereon shall be entitled accordingly.