Vincent A. Ltjpiano, J.
The plaintiff, Stanley Fingerhut, sues the defendant, Kralyn Enterprises, Inc., to rescind a contract allegedly made when he was mentally incompetent, in that he was in the manic phase of the ailment, manic-depressive psychosis.
In the summer of 1968, he was the sole general partner in a private investment company called Mt. Vernon Associates.
He was then 33 years old and unmarried. He was an investment advisor, having been a customer’s man for a well-known brokerage house. His yearly earnings averaged more than $50,000 over a period of five years. In 1967 he formed the investment company with 16 limited partners, which increased its capital from $3,000,000 to over $5,000,000 within a period of two years. This large increase was greatly due to plaintiff’s efforts who, himself, had invested $153,000.
He was a member of a golf club and prior to the transaction involved here, toured various country clubs, because he wanted to Wy one.
He investigated the Bel Aire Golf & Country Club. He obtained an appraisal of Bel Aire which valued the property on February 21, 1968, at $2,728,000 exclusive of the personal property, furnishings, etc. The personal property represented an investment of $275,819.70.
On September 22, 1968 plaintiff and his attorney, Bichard J. Bubin, associated with the law firm Gainsburg, Gottlieb, Levitan & Cole, drove to Bel Aire. They informed the Krassners, majority stockholders of the club, that plaintiff desired to purchase the golf club. The Krassners then sent for their lawyer, Seymour Babinowitz. Negotiations took place between the parties and their lawyers and the price of $3,075,000 was agreed upon. Bubin, in the presence of plaintiff, wrote the binder in longhand. The parties executed it, in the presence of their respective lawyers. Plaintiff gave a check for $25,000 to the defendant.
On September 25, 1968, the parties met at the offices of plaintiff’s lawyers to discuss the making of a formal contract and after six hours of strenuous negotiating a contract was made.
On September 26, 1968 that contract was executed and plaintiff paid a further sum of $200,000. Both sums were to be held in escrow by defendant’s' attorney, Babinowitz. The balance of $2,850,000, was to be paid upon the closing of title scheduled on November 15, 1968, or sooner, at the option of the purchaser who also had the right to adjourn the closing to December 15, 1968.
*848 The property was encumbered with three mortgages aggregating $1,950,000. At least $900,000 was needed to take title, plus adjustments and inventory, depending on whether preliminary negotiations relating to the extinguishment or extensions of the existing mortgages were successful. If not successful, the buyer was obligated to cover such mortgages with cash. In this area, the binder had provided for an all cash deal. However, the buyer, in the subsequent contract, was allowed to arrange his own financing, with provision that the seller would assist the buyer in obtaining extensions of the first and second mortgages; in such case, the seller would accept a purchase-money mortgage up to $400,000. Such co-operation was afforded, apparently, on the premise that plaintiff might not have available to him sufficient funds to acquire the property free of all the mortgages at the time of closing.
At the request of plaintiff’s counsel, a liquidated damages clause, providing that in the event of buyer’s default, seller was entitled to retain all sums paid in escrow, was eliminated. In the contract, the escrowee was authorized to use the escrow funds in making payment of $22,894.73 for the 1968-1969 school taxes, $1,422.89 for supplies and labor to maintain the golf course, and $100,000 on account of the third mortgage, which installment was coming due in December. Such payment reduced the mortgage to $194,000. Plaintiff, having consented to such payments amounting to $124,317.62, with credit to be given the buyer at the closing, the sum of $100,682.82 was left.
The deal was never consummated.
On November 8, 1968, plaintiff, through his attorney, sent a letter to the defendant which, amongst other matters, “ elected to adjourn closing of title until December 15, 1968.”
On November 19,1968, plaintiff’s attorneys wrote defendant’s attorneys as follows: “Yesterday, November 18, 1968, we met with Stanley Fingerhut for the purpose of discussing with him the progress, if any, of his arranging financing for the above transaction.
“ We were apprised for the first time that Mr. Fingerhut suffers from a manic depressive psychosis, a condition for which he has received medical treatment for the past years. We were advised, and competent medical authority will substantiate, that Mr. Fingerhut prior to September 22, 1968, and until recently, was in the manic stage of his illness and wholly incompetent and totally incapable of managing his own affairs during that time.
‘ ‘ Accordingly, we submit that the binder agreement between the parties, and the contract dated September 26, 1968, were *849 made during a period when our client wholly lacked sufficient mental competence to contract on his behalf and would not have entered into the agreement but for the existence of the mental disorder.
‘ ‘ Based upon the foregoing, our client has instructed us to give you notice, and we do so, by this letter that he elects to rescind the binder of September 22, 1968, and the contract of September 26,1968, and demands the return of the $225,000 given by him thereunder as a down payment. * * *
“ We must request that you contact us in order that we may confer on this matter. ”
No agreement was reached and this action was commenced on December 16, 1968; a lis pendens in the sum of $124,317.62 was filed on the basis that such moneys were expended to increase defendant’s equity in the property. Prior to the commencement of the action, on the date set for the closing, defendant tendered a deed and demanded payment of $2,850,000. The deed contained no recital that it was subject to any existing mortgages or encumbrances. After the plaintiff elected to rescind, the escrowee handed over the moneys to the defendant.
The complaint asks for judgment that the contract be rescinded and declared null and void, and defendant be ordered to return the down payment of $225,000, and that a lien be impressed on the property for the sum of $124,317.62.
The answer originally contained a first defense and counterclaim alleging that defendant had duly tendered to the plaintiff a good and proper deed, but plaintiff declined to take title and pay the balance of the purchase price. The counterclaim sought $500,000 as' damages; as a second defense and counterclaim, defendant pleaded that it had no adequate remedy at law, and demanded specific performance.
The first counterclaim was stricken because of defendant’s failure to furnish information sought by-plaintiff in the bill of particulars concerning its alleged damage. The second counterclaim was discontinued during trial. This is a summary of the state of the pleadings except for the disposition of a motion made by the defendant at the close of the plaintiff’s case, and renewed at the close of the whole case, by which defendant sought to amend the pleadings to conform with the proof to the extent that plaintiff, after recovery from his alleged psychotic condition, proceeded to perform acts in reliance upon and in furtherance of the September 26,1968 contract, and thereby ratified the contract and waived any right he might have had to rescind. While not originally pleaded, defendant urges that it was impos *850 sible to plead ratification in advance of trial, since sufficient facts relating to the proposed ratification were not uncovered or divulged until the trial developed. Decision thereon was reserved.
The motion is granted in the exercise of discretion, and ratification will be considered.
It was stipulated that the defendant and its attorneys, during the crucial period involved herein, were unaware of the mental condition of the plaintiff; nor did they have any reason to believe that such condition existed; plaintiff’s attorneys were also unaware of such condition, and similarly had no Reason to believe such condition existed. Further, it is uncontradicted that the purchase price was fair and reasonable and there was no overreaching.
The contract of a mental incompetent is voidable at the election of the incompetent (Blinn v. Schwarz, 177 N. Y. 252), and the burden of proving incompetencé is upon the party alleging it.
This case, with its interesting facets, should be particularly examined in light of two recent cases: Ortelere v. Teachers’ Retirement Bd. of City of N.Y. (25 N Y 2d 196 [1969]) and Faber v. Sweet Style Mfg. Corp. (40 Misc 2d 212 [1963]).
Before the advent of these cases, contractual mental capacity was measured by the so-called cognitive test (see Aldrich v. Bailey, 132 N. Y. 85). Similarly, in Paine v. Aldrich (133 N. Y. 544, 546) it was held that if rational judgment could be based on “ [a] mental capacity at the time of the execution * * * that he could collect in his mind without prompting, all the elements of the transaction and retain them for a sufficient length of time to perceive their obvious relations to each other ”, such judgment would be enough to prevent avoidance of the transaction on the claim of mental incompetency.
The Faber case, followed by the Ortelere case, became landmark authorities, which legally recognized the ailment manic-depressive psychosis where the afflicted one is aware of what he is doing hut cannot help himself against the compulsion which controls his actions and impairs rational judgment.
Judge Bbeitel, writing for the majority in Ortelere {supra, p. 202) said: “ The well-established rule is that contracts of a mentally incompetent person who has not been adjudicated insane are voidable. * * * Traditionally, in this State and elsewhere, contractual mental capacity has been measured by what is largely a cognitive test [citing authorities] ”. In further discussion of the evolution of the law from the cognitive test based on traditional standards to a more enlightened psychi *851 at.ric acceptance of the mental illness manic-depressive psychosiá, Judge Breitel alluded to the standards of the past governing competency to contract which were formulated ‘ when psychiatric knowledge was quite primitive * * * [and which] fail to account for one who by reason of mental illness is unable to control his conduct even though his cognitive ability seems unimpaired ” (p. 203). Thus, a motivational standard has found its place in the law by dint and force of what persuasive psychiatrists expounded.
With such progress and understanding, we have gone beyond the days when psychiatric knowledge was finding itself. And these cases, Faber and Ortelere {supra), representative of the problem at hand, plainly say that incompetency to contract may exist, despite the presence of cognition, when a contract is made under the compulsion of manic depressive psychosis.
In Faber (40 Misc 2d 212, 216, supra), guidelines are given: “ Whether under the latter test a manic will be held incompetent to enter into a particular contract will depend upon an evaluation of (1) testimony of the claimed incompetent, (2) testimony of psychiatrists, and (3) the behavior of the claimed incompetent as detailed in the testimony of others (Green, Judicial Tests of Mental Incompetency, 6 Mo. L. R. 141), including whether by usual business standards the transaction is normal or fair (Green, Proof of Mental Incompetency and the Unexpressed Major Premise, 53 Yale L. J. 271, 299-305).”
A caveat, however, in Ortelere (supra, p. 206), is handed down by the Court of Appeals while placing its seal of approval on the motivational standard. “ Of course, nothing less serious than medically classified psychosis should suffice or else few contracts would be invulnerable to some kind of psychological attack ”.
As this court views this problem, the evidence, for our purpose, must involve the personality of the plaintiff, the nature of the deal at stake, the circumstances and the manner in which the contract was entered into, the behavior of the plaintiff juxtaposed to the contract and in some aspects of his life going beyond the limited range of the making of the contract, the medical history and evaluations regarding plaintiff’s alleged psychosis or lack thereof. Upon such considerations, the ultimate and salient determination will be made as to whether the plaintiff was a manic-depressive psychotic and, if so, was he in the manic phase of that illness when the binder and contract were executed.
Plaintiff’s medical history dates back to October 14,1964 when he was hospitalized at the Gracie Square Hospital for manic-depressive reaction, manic type. On October 21, 1964 he was *852 transferred to Mt. Sinai Hospital, from which he was discharged on October 27, 1964. Mt. Sinai diagnosed his condition as ‘ ‘ schizophrenic reaction with manic manifestation. ’ ’ On November 16,1964 plaintiff was admitted for the second time to Grade Square Hospital, diagnosed as ‘ ‘ manic depressive reaction, manic,” and discharged on December 2,1964. There he received six electric shock treatments.
On September 5, 1965 plaintiff was again admitted to Gracie Square Hospital for “ manic depressive reaction ” and discharged on October 5, 1965.
During the period from November 14, 1964 to September 16, 1965 plaintiff was under the care of Dr. Leonard Cammer, a psychiatrist. Dr. Cammer diagnosed plaintiff’s condition as manic-depressive psychosis, mixed type.
From March 31, 1966 until May, 1968 he was treated by Dr. Alexander Thomas, who made the following diagnosis: “ (1) Manic depressive syndrome, (2) Psychoneurosis, character disorder. The symptoms were severe. Although he was at no time psychotic during my period of treatment of him. ’ ’
On July 11, 1968 plaintiff saw Dr. Richard S. Dolins. In July Dr. Dolins saw plaintiff 9 times; 11 times in August; 9 times in September; 3 times between October 1 and 15; 6 times in November; twice in December and, in 1969, on January 4, 7, 8 and on January 25, when he saw him for the last time.
Dr. Dolins, plaintiff’s witness, testified and diagnosed plaintiff’s condition as manic-depressive psychosis, but qualified such finding in declaring that he did not find plaintiff psychotic until the early part of September, about September 13, and continued being psychotic until November 5, 1968 when he was no longer psychotic. Dr. Cammer and Dr. Thomas did not testify.
Dr. Nathan Kline appeared as a vntness for the plaintiff. He testified as one who has been and is still treating plaintiff from February 17,1969. His evaluations were further based on previous reports of the doctors and the hospital records in evidence.
He stated that the characteristic symptoms of manic-depressive psychosis are mood swings, which pass the bounds of normalcy, so that the individual, in one or more areas, is no longer responsible or capable of managing his life in a general fashion, particularly in areas in which he is not familiar. He further testified that the lay person might not recognize either the symptoms as being related to the illness, or that the individual was psychotic.
In his opinion, therefore, it is possible to be psychotic in certain areas and not psychotic at all in. other areas, during the *853 same time. When asked when plaintiff became psychotic, if at all in September, 1968, he responded, “ I would, if you wanted to be strictly technical about it, if by psychosis you mean getting so far out of touch with .reality that you are seriously injuring yourself, I would say that the time he gave a check for $25,000, which constituted this point of fact, direct evidence of his having passed over the border from normality to pathology.” In answer to the question as to whether it was psychotic for this man to enter into this' deal involving $3,075,000, the answer came: “ You have put the cue on the word man. For this particular man that act was psychotic. It may not have been for someone else and it may not have been for him under other circumstances.”
Dr. Abrahamsen testified as defendant’s expert psychiatrist. He examined plaintiff on April 6,1971. He read plaintiff’s medical history, was present in court when Dr. Dolins testified and read the stenographic record of the testimony of Dr. Kline. He states that plaintiff had some mood swings and many neurotic traits but found nothing psychotic about him. He found that plaintiff was not psychotic at all during the period from mid-September to November, 1968. He characterized plaintiff’s personality makeup as a neurotic character disorder with reactive depression. He found it medically significant that plaintiff was not hospitalized in 1968, or given strong medication or shock treatment and that the frequency of treatment was not increased. He states that psychosis is a condition and that one cannot on the same day be psychotic as to some actions and not as to others. The lines are thusly drawn with respect to the crucial time involved. Plaintiff’s experts say plaintiff was psychotic. Defendant’s expert says plaintiff was only neurotic.
In Faber (40 Misc 2d 212, 216-217, supra) the Court uttered the following: “ Moreover, in the great majority of cases psychiatrists of equal qualification and experience will reach diametrically opposed conclusions on the same behavioral evidence. The courts have, therefore, tended to give less weight to expert testimony than to objective behavioral evidence (Halpern, Civil Insanity: The New York Treatment of the Issue of Mental Incapacity in Non-Criminal Cases, 44 Corn. L. Q. 76; Green, op cit., 53 Yale L. J., p. 306).”
In September, 1968 plaintiff sought to amend the agreement of limited partnership under which Mt. Vernon Associates had been established. He retained a prestigious law firm in this connection. On October 1,1968 plaintiff sent a memorandum to Ms partners -in Mr. Veynon Associates asMng their consent to *854 certain transactions including: “ 1. The purchase of Stanley Fingerhut of the Bel-Aire Country Cluh located in Westchester County. Mr. Fingerhut does not plan to be active in the day to day management of the club but will retain professional management to do so. ’ ’
On October 7,1968 plaintiff, with his attorney, and the Krassners and their attorney, met with one Bogert, an officer of the bank which held the first mortgage on Bel Aire. They discussed the refinancing of the club mortgage on behalf of the prospective purchaser. Plaintiff gave the bank his reference and authorized the bank to check it, and it received the following report: “ The subject [Stanley Fingerhut] is an ex-broker and partner in a major brokerage house. He is the founder and manager of Mt. Vernon Associates * * * The fund has been very successful and is now worth over $3MM * * * He is very well versed in the operation and is one of the most respected men in the hedge fund business. His personal net worth is in seven figures.
“ The bank has extended loans to the fund to moderate 7 figures, secured by marketable securities. Mr. Roach and other members of Chemical’s management know Fingerhut personally and have a high opinion of him and of the company. Mr. Roach expressed the opinion that Fingerhut should have no trouble paying off an $864 M mortage over a number of years.”
Bogert testified that during his conference the words and actions of plaintiff impressed him as rational.
Plaintiff sought to bolster the testimony of his medical experts by adducing bizarre conduct on his part. Within this province, Goldner, plaintiff’s comanager in Mt. Vernon Associates, testified that in about August, 1968, plaintiff began to act strangely with regard to security investments, that he gambled and lost large sums of money, contributed to the Black Panther movement, boasted about women, bought a large quantity of ducks for a party he was giving, and employed unqualified and unnecessary people for a period of a month to indulge a whim on his part. Mary Scully, plaintiff’s secretary, testified about quarrels between G-oldner and plaintiff concerning investment decisions and that plaintiff resorted to foul language, which had not been his custom. Other so-called “ bizarre ” conduct was alluded to and testified to.
Defendant, in contradiction, and to support its medical version, presented witnesses to prove plaintiff’s words and actions were rational. Ip this framework, Donald Klopfer, the chairman of a large publishing house and a limited partner in Mt. *855 Vernon Associates, having invested $200,000 after meeting the plaintiff in September, 1968, testified that plaintiff’s words and actions impressed him as being rational.
Martin Mayer, an author, who in September, 1968, was writing a book to be called “ New Breed on Wall Street,” interviewed plaintiff in connection with that book on September 20, 1968 at the office of Mt. Vernon Associates. Groldner, then about to become a general partner, was also present. The interview lasted about 45 minutes. Mr. Mayer concluded that plaintiff’s words and actions impresed him as rational. The book appeared in the spring of 1969 and contained the material of the interview and a photograph that had been taken later.
Lester Degenstein, a stockbroker, who knew plaintiff from frequent meetings, recommended investing in Mt. Vernon Associates to customers of his, such as Messrs. Klopfer, Boscowitz and Livingston. Plaintiff’s words and actions during the period from October, 1967 to December 31, 1968 impressed Degenstein as rational.
In similar vein, Harry Gr. Herman, a former Surrogate of Westchester County who has known plaintiff and his parents for many years, testified. Both plaintiff and the witness were members of the same golf club and played golf together.
Robert L. Livingston, who became a limited partner in Mt. Vernon Associates on July 1, 1968 to the extent of investing $100,000, had spoken to plaintiff on the telephone several times and had met plaintiff for lunch in the latter part of October, 1968. He, too, stated that plaintiff’s words and actions were rational.
Morris Thau, an old friend of plaintiff’s and his father, on the basis of that friendship and business dealings since 1964, characterized plaintiff’s conduct as rational. Thau had become a limited partner in Mt. Vernon Associates when it was organized and had invested $200,000.
The situation before us here is unlike that in the Faber case (40 Misc 2d 212, supra). Plaintiff did not go on a buying spree. He invested in a $3 million hedge fund he had started in 1967 which, in a short period of time, grew to over $5 million. Plaintiff was known as a supersalesman. Dr. Dolins agreed that he was. Plaintiff had a penchant and ability for raising money. Differently, the frenetic conduct of the incompetent, in Faber, as affecting that transaction, was characterized by the court as being irrational and abnormal, highlighted by ‘ ‘ The rapidity by which the incompetent moved ” in the performance of those questionable acts. Without detailing such acts, it suffices to say *856 that the incompetent’s conduct, done without the benefit of legal representation, as is found here, was so greatly abnormal that the court was convinced, with the aid of medical testimony, that he had acted under the compulsion of a psychosis. In our circumstances, the plaintiff accepted, in major and important part, the advice of his lawyers. In Faber, the incompetent acted against the advice given by his lawyer, and the contract was signed in the absence of any lawyer. It should be further noted, that about two weeks following the signing of the contract, the incompetent, Faber, was sent to a mental institution. There is no parallelism in the essential aspects. On the contrary, the evidence at hand moves across a wider period of time with a more calculated and studied purpose, reflected from the concerned comparison of country and golf clubs, extending to November 19,1968, when the plaintiff elected to rescind the contract he had made with the expert advice and collaboration of his lawyers, precautionary and deliberate acts intervening.
Plaintiff, unlike the Ortelere case (25 N Y 2d 196, supra), was able and did care for himself, attended to his business, had a substantial income and net worth of about $350,000. Also, Ortelere deals with a sick woman who was so completely unable to manage her affairs that her husband gave up his job and devoted himself to taking care of her. Moreover, the court there observed that the defendant was, or should have been, fully aware of her condition, which gave rise to the retirement option she selected. Here, the defendant and attorneys for both parties, were unaware of any alleged psychosis, and knowledge of a condition could not be imputed to any of them.
On the whole, whatever behavior has been ascribed to the plaintiff as being irrational or bizarre does not reach sufficient level to overcome the strength and character of plaintiff’s conduct, which was testified to as rational. The net result of the credible evidence in this area, conjoining with the medical evaluation of the experts and other medical evidence, convinces the court that the plaintiff was not in the manic phase of the ailment, manic-depressive psychosis, during the period the binder and the agreement were entered into. Asked by the court for a definition of “ psychotic ”, Dr. Kline replied: “Psychotic means there is a defect in thinking, in feeling, in behaving and memory in relationship to reality in general to such a degree that the individual is incapacitated or is incapable of adequately managing his affairs ”.
The credible evidence does not put the plaintiff within that definition. With cognition, and without stress of psychosis, his *857 rational judgment was not impaired during the period the binder and agreement were made. And while there were some neurotic manifestations, the condition responsible for this behavior was insufficient to render Mm legally incompetent to make a contract.
It follows that plaintiff has failed to sustain his burden of proving that when he executed the binder and contract he 6 ‘ did so solely as a result of serious mental illness, namely, psychosis ”. (Ortelere, 25 N Y 2d 196, 206, supra.)
The record, at this point, will reflect the court’s decision to ■strike the answers and the questions which allowed the plaintiff’s experts to testify, subject to the court’s reconsideration that in their opinion the binder and. agreement were the end results of the alleged psychosis. Such testimony invades the province of the trier of the fact. (Wyse v. Wyse, 155 N. Y. 367; see, also, Dougherty v. Milliken, 163 N. Y. 527; Clark v. Iceland S. S. Co., 6 AD 2d 544.)
Therefore, plaintiff in a competent mental state, had no valid excuse in refusing to perform an enforceable contract, and his default subjected him to the rule that a buyer who defaults on a contract to buy real property may not recover Ms down payment. This rule of law was enunciated in Silverstein v. United Cerebral Palsy Assn. (17 A D 2d 160). The court said (pp. 164-165): “ Where the payment by a vendee was a down payment on the purchase price * * * and he willfully defaults under his contract, it is settled in this State that he may not in law or in equity recover Ms down payment even though the vendor resells the premises for a sum equal to or greater than the contract price.”
As to the importance wMch plaintiff attaches to the elimination of the liquidated damages clause from the contract, as bearing on the question of damages and the retention of the down payment, answer is given to such plaint in Warren’s Weed, New York Real Property (vol. 1A [4th ed.], Contracts, § 11.01) where it is said: “ In some contracts there are provisions concerning the remedy wMch a party may be entitled to upon the default of the other. The clause that is most often used is to the effect that upon default by the purchaser the seller may retain the money paid on account of the contract. There seems, however, to he no essential reason why such a provision should he inserted. Unless the parties agree that the retaining of such sum shall be in full satisfaction of the damages sustained by the vendor, it is the usual rule that, where the purchaser is in default, he cannot recover back the money paid on signing the agreement. This right of the vendor to retain the deposit is not aided by any *858 contract clause. Even without such a clause the right to retain the deposit exists. It is only where such retention is to he the vendor’s sole remedy that a provision to that effect is needed in the agreement.” (Emphasis supplied).
Nor can the claim by plaintiff that the seller’s tender of performance was essentially lacking prevail Such claim must fail in the light of plaintiff’s anticipatory repudiation of the contract by his letter of November 19, 1968 (Cohen v. Kranz, 12 N Y 2d 242; Alpine Cts. v. Wiedermann, 34 A D 2d 951 and authorities cited therein).
On all the contentions urged by the plaintiff, plaintiff cannot recover the down payment, nor can he obtain the relief sought in the complaint.
Moreover, the contract may be validated on the basis that even had the binder'and agreement been tainted with psychosis, the contract was later ratified by the “conscious action *’ of the plaintiff after November 5, 1968, when Dr. Dolins says he was free of psychosis. Dr. Dolins, plaintiff’s treating and testifying doctor, declared that on November 5,1968, plaintiff was no longer psychotic. With such a’concession, the letter dated November 8, 1968, from plaintiff’s lawyers to defendant’s lawyer, Seymour Rabinowitz, takes on cogent and significant evidentiary meaning. Therein it was stated that ‘ ‘ the purchaser has elected to adjourn closing of title until December 15, 1968.” The letter was more than a mere request for adjournment purpose. Other matters, in recognition of the contract, were taken up. A dispute over a billing for labor was made the subject of discussion and was resolved, by authorization, to remit to Rabinowitz’s client, the seller, the amount of $1,422.89, constituting “ payment for material and labor as per said correspondence ”. Acknowledgment of that remittance was requested by letter.
The letter continues: “ Tour’s of October 29 is in error concerning the furnishing of material for membership application. Mr. Fingerhut presented to seller in writing his proposed rate schedule which was unacceptable to sellers. There were several conferences between the parties concerning this schedule, the last of which was attended not only by the parties but by their respective counsel. No agreement nor solution was arrived at and it was decided that further negotiations would continue. We will not accept any expenses incurred in the solicitation by your clients of renewal applications and preparation of any material for same * * * Ton have also failed to mention ■whether or not your clients ate notifying prospective members and existing members that a minimum food and beverage charge *859 of $600 will be levied on the 1969 members. In light of our notice herein adjourning the closing, no comment need be made on the Thanksgiving Dinner reservations. Please be advised that we are continuing to interview prospective managers and have not as yet found someone whom we deem suitable for this position of great consequence.”
The communication was written after November 5,1968, when Dr. Dolins testified he saw plaintiff following the doctor’s return from a vacation. Dr. Dolins was then satisfied that plaintiff was no longer psychotic. It was on that visit that plaintiff told the doctor he ‘ ‘ could not raise the money ’ ’ and he ‘ ‘ was considering the adjournment of that closing from November 15 to December 15, so that he could raise the money ”. After November 15, 1968 patient and doctor met again and Dr. Dolins testified:
“ Q. Now you saw him thereafter on November 15, is that right?
“ A. Yes.
“ Q. Did you ask him on that occasion whether he adjourned the closing?
“ A. I think, yes, I think so. I think it had been, as I remember, it had been adjourned.
“ Q. He had gotten an extension of time?
“A. Eight.
“ Q. On the closing?
“A. Eight.”
On November 19, 1968, when they met again, Dr. Dolins testified, plaintiff told him he “ wished he could get out of it ”.
The November 8 letter when read represents confirmation and indicates a purpose, on plaintiff’s part, to proceed with the contract and effect the closing. For that important reason, the letter has been, in part, quoted. It bears heavily on defendant’s defense that plaintiff, by acts of recognition and reliance, ratified the contract at a time he was competent to do so, if, indeed, he had not been at the time of its making.
He did not testify or raise his voice in any manner to protest that such a letter was sent without his permission or knowledge. At this point, comment on his refusal to take the stand is appropriate, since that question affects the matter being instantly considered, as well as other matters developed at the trial, which could have been the subject, or object, of his supporting or countervailing testimony. The plaintiff was in the courtroom for at least part of the trial, which extended beyond three weeks. He elected not to take the stand. He could have contradicted, *860 corroborated or explained, if he chose, the evidence bearing upon his conduct and the motivation which prompted the making of the binder and contract. He could have even lent support to any phase which was favorable to his cause, but which had come under attack requiring bolstering.
He never reappeared at the trial. He was and is not a judicially declared incompetent. Dr. Kline testified that plaintiff is not presently psychotic and continues under his care and treatment. Yet, no opinion was sought for or advanced that because of illness, or for any cause, he was not available or unable to testify. Interestingly, at some juncture during the trial, while plaintiff was seated in the spectator part of the courtroom, the question of his age arose during the examination of a witness. Voluntarily, Mr. Fingerhut arose in and in open court, responded: “ I will be 36 June 5th.” That was the fullest extent of his ‘ testimony, ’ ’ albeit unsworn.
Under these circumstances, the court will invoke the adverse inference rule applicable to one who is able to testify with knowledge upon certain matters in the record, but does not. Specifically, plaintiff has failed to testify concerning his participation in the making of the November 8, 1968 letter; whether he had any knowledge of it, or its purpose. In face of the evidence, it becomes an accepted fact that he did have knowledge of the letter and approved its purpose. Certainly, the testimony of Dr. Dolins, as to plaintiff’s knowledge of the letter, recounted above, would in itself be corroboration of that finding.
Plaintiff cannot palliate this failure on the ground that the defendant expressed an interest to call the plaintiff on its side of the case, and did not. Firstly, plaintiff had the roles of party and witness, and the party who is naturally expected to call a witness should not be relieved of the possible unfavorable consequence of his own failure to do so. Particularly, where the witness, such as the plaintiff, could be a hostile witness. (Reehil v. Fraas, 129 App. Div. 563, 566, revd. on other grounds 197 N. Y. 64.) There is warrant, therefore, to apply the stamp of weakness with respect to much of the evidence that pervades the record in this particular vein (see Perlman v. Shanck, 192 App. Div. 179; Milio v. Railway Motor Trucking Co., 257 App. Div. 640). As aptly stated in Dowling v. Hastings (211 N. Y. 199, 202) ££ where one party to an action knowing the truth of a matter in controversy and having the evidence in his possession, omits to speak, every inference warranted by the evidence will be indulged in against him.”
*861 The defendant has sustained the burden of proving ratification of the contract. The evidence clearly indicates that plaintiff, without mental disability, ratified the contract. Borrowing from Faber (40 Misc 2d 212, 217, supra), there was “ conscious action” on plaintiff’s part which recognized the contract at a time when he was not psychotic. In adjourning the closing of title and conduct pertaining thereto, he demonstrated knowledge of the existence of the contract, with confirmation of it as a contractual obligation; and though he regretted its making, he, nevertheless, acted in furtherance of the contract.
While it may be unfortunate that the plaintiff ‘ ‘ bit off more than he could chew ”, the relief he seeks must be denied.
The motion to dismiss the complaint is granted.