Edward M. Hobby, S.
The action bef ore the court was initiated by a petition seeking to compel, the executor to execute and deliver over a deed to real property. The petition alleges that the decedent, one John Gebauer, entered into a written contract dated August 7, 1971 to sell to the petitioner, John L. Whitmer, a parcel of land containing 25 acres located in the Town of Ellicottville, Cattaraugus County, New York, for a purchase price of $2,500. The petition alleges the delivery and receipt of a down payment of $200 at the time of the execution of the agreement. It alleges the readiness and willingness of the petitioner to perform at all times. Finally, it alleges a breach of the agreement by the decedent during his life and ownership and seizure of the real property by the decedent at the time of his death. It concludes with a prayer for relief that the executor of the estate of the contracting seller be compelled to deliver to petitioner a deed and to perform all conditions set forth in the contract.
The answer to the petition filed by the respondent executor is somewhat novel. It alleges as a first defense that the contract was obtained by fraud and deceit in that: (a) the petitioner knew that the decedent “ was in ill health and, in fact, physically and mentally incompetent to enter into a contract ”, and (b) that the petitioner “ surreptitiously and knowingly spirited the decedent from the home of his daughter where he was being cared for and conveyed him to the office of an attorney where the alleged contract was prepared and executed all without knowledge of decedent’s family”. A second separate defense alleges that ‘1 notice of the infirmities in the alleged contract were given to the petitioner through his then attorney, Fred C. Rider, Esq., by virtue of written communication from the attorneys for the decedent ”.
At the commencement of the trial, counsel for the respondent executor objected to the jurisdiction of the court. The basis of *717 the objection asserted was that a Surrogate’s Court lacked jurisdiction to determine in an independent proceeding the rights of a vendee of real property claiming under a contract of sale with a decedent. The contention made was that a Surrogate’s Court could only determine title as a collateral issue to an accounting proceeding, or other proceeding already instituted in Surrogate’s Court.
The confusion of the attorney for the respondent executor apparently stems from those judicial determinations relating to the jurisdiction of a Surrogate’s Court under former Surrogate’s Court Act and concerning contracts other than for the conveyance of real property. It is true that prior to the adoption of the Surrogate’s Court Procedure Act there were extant judicial determinations that in considering contracts other than those for the conveyance of real property the equitable powers of the Surrogate’s Court could not be exercised in an independent proceeding, but only collaterally to an accounting or other specified proceeding over' which the court had specific statutory jurisdiction. These judicial determinations were based upon a construction of former section 40 of the Surrogate’s Court Act. (See Matter of Venblow, 2 AD 2d 365 [reviewing earlier determinations], and Matter of Guetta, 17 Misc 2d 837.)
However, it appears that the limitation imposed by these determinations delimiting the equitable jurisdiction of the Surrogate ’s Court to specified proceedings was changed by the adoption of the Surrogate’s Court Procedure Act. This new act provides that “ the proceedings enumerated in this act shall not be deemed exclusive and the court is empowered in any proceeding, whether or not specifically provided for, to exercise any of the jurisdiction granted to it by this act or other provisions of law, notwithstanding that the jurisdiction sought * * * is or may be exercised in or incidental to a different proceeding.” (SCPA 202.)
The revisers of the Surrogate’s Court Act said that the very purpose of this new statute (SCPA 202) was to prevent the interpretation that was made in Matter of Venblow (supra) and that SCPA 202 was intended to complement the application to the Surrogate’s Court of the provisions of section 2-b of the Judiciary Law. It is this latter statute that grants to courts of record the power to devise and make new process and forms and proceedings necessary to carry into effect the powers and jurisdiction granted to the court. As stated, the statutory purpose of enacting SCPA 202 was to enable a Surrogate’s Court ■to grant directly any relief which it could grant incidental to *718 another statutory proceeding. The general equitable powers of a Surrogate’s Court provided under SCPA 201 were expanded in their application by the adoption of ¡SCPA 202. (See revisers notes to SCPA 202 in 20 N. Y. Std. Civ. Prac. Serv., p. 61, and Practice Commentary, McKinney’s Cons. Laws of N. Y., Book 58A, § 202, p. 144 et seq.)
It is not necessary here, however, to limit the decision as to jurisdiction upon this expanded application of the equitable powers of a Surrogate’s Court under SCPA 201 and SCPA 202. This is for the reason that a Surrogate’s Court has long had jurisdiction to try, in an independent proceeding, those cases “ where a decedent dies ¡seized of real property after he has made a contract for the conveyance thereof ”. Such jurisdictional authority was conferred on the Surrogate’s Court by section 227 of the former Surrogate’s Court Act. It was repeatedly held that the general equitable jurisdiction of the Surrogate’s Court provided for under section 40 of the former Surrogate’s Court Act, to wit: “ to make a full, equitable and complete disposition of the matter by such order or decree as justice requires ’ ’ was applicable without limitation when the equitable proceeding related to the enforcement of a contract made by a decedent for the sale of real property. (See Matter of Gerhardt, 261 App. Div. 140, 142-143; Matter of Venblow, 2 A D 2d 365, 370-371, supra.)
Specific statutory authorization for such an equitable proceeding has been continued under the new Surrogate’s Court Procedure Act. SCPA (§ 1921, subd. 2) specifically provides that a petition may be filed on behalf of a vendee praying for a decree •that a deed be made and delivered for the conveyance of real property under contract of purchase from a decedent. That is precisely the prayer for relief made by the petitioner in the case at bar.
This court holds that the jurisdiction of the Surrogate’s Court to hear, try and determine the issue raised in the instant proceeding exists under both: (1) the equitable jurisdictional provisions of SCPA 202 and SCPA 201 and (2) under the provisions of SCPA (1921, subd. 2).
The court considers now the matters in dispute. The principal contention of the respondent in this proceeding is that the decedent was non compos mentis at the time that the decedent entered into the contract for the sale of the realty. As a consequence thereof, the respondent urges that the contract is null and unenforceable.
*719 As in all cases, the facts in the case at bar should be measured within the applicable law. Until relatively recent times the framework of the appropriate legal principles was relatively easy to form. It was accepted in this State and in general: (1) that the contract of an unadjudicated incompetent was voidable, (2) that the burden of proving incompetency was upon the party asserting it and (3) the proper test of incompetency was whether the contracting party was capable of understanding and appreciating the nature and consequences of the particular transaction in contest. (Blum v. Schwarz, 177 N. Y. 252; Aldrich v. Bailey, 132 N. Y. 85; Paine v. Aldrich, 133 N. Y. 544.) This court has discovered no change in the first two recited principles of law. However, there has been change in regard ■to the appropriate test or tests to determine incompetency.
In 1963 the decision of Faber v. Sweet Style Mfg. Corp. (40 Misc 2d 212, 216 [Meyer, J.]) held “ incompentenc[y] to contract also exists when a contract is entered into under the compulsion of a mental disease or disorder but for which the contract would not have been made. ’ ’
In 1969 in Ortelere v. Teachers Retirement Bd. of City of N. Y. (25 N Y 2d 196), the Court of Appeals, after quoting the same, approved the principle announced in the Faber (supra) decision. The court cited with approval the recommendation contained in Michigan Law Review (vol. 57, pp. 1020, 1036) viz: “ that a complete test for contractual incapacity should provide protection to those persons whose contracts are merely uncontrolled reactions to their mental illness, as well as for those who could not understand the nature and consequences of their actions ’ ’ (Ortelere, p. 205). The court adopted with approval (p. 204) the provisions of Restatement, Contracts 2d (§ 18C, subd. [1], par. [b]) which recites: “ (1) A person incurs only voidable contractual duties by entering into a transaction if by reason of mental illness or defect * # * (b) he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition ”.
As Justice Lupiano has observed, the decision in Ortelere stands for the proposition “ that incompetency to contract may exist, despite the presence of cognition, when a contract is made under the compulsion of manic depressive psychosis.” (Fingerhut v. Kralyn Enterprises, 71 Misc 2d 846, 851.)
It is clear that with the decision in Ortelere a new motivational standard to determine incompetency was introduced into the jurisprudence of this State.
*720 "What is not clear to this court is whether the new motivation test established by the Ortelere decision is an addition or a replacement to the “ prior * * * cognitive standard giving great weight to objective evidence of rationality ”, (Ortelere v. Teachers Retirement Bd. of City of N. Y., 25 N Y 2d 196, 204, supra.)
The criticism of the Court of Appeals of the former rules for the determination of incompetency and the basis upon which they rested would seem to argue that the motivational test is a replacement to prior tests, e.g\, since “ because the cognitive rules are, for the most part, too restrictive and rest on a false factual basis they must be re-examined. ’ ’ (Ortelere, 25 N Y 2d 196, 203, supra.) This is especially true when the criticism by the Court of Appeals was followed by the recitation of only the motivational test that is set forth in section 18C (subd. [1], par. [b]) of Restatement, Contracts 2d. Similar implication of replacement is found in the note in Syracuse Law Journal by Howard L. G-reenberger. There, after calling the Ortelere decision “ the most important civil case to be decided within the past decade ”, and referring to the opinion as “ truly remarkable” and “ [one] that will undoubtedly become a modern classic [as evidencing] a complete mastery of not only traditional legal literature and theory, but of modern psychiatric learning as well ’ ’, the author stated that the opinion in Ortelere frankly noted that the court intended to depart from the line of cases in New York which placed such great weight on objective evidence of rationality. (22 Syracuse L. Rev. 187, 189.)
Despite the foregoing indications of replacement, this court reaches the conclusion that the motivational test announced in the Ortelere decision is only an additional test of incompetency in contract. That conclusion is based on the following considerations. In his dissent in Ortelere, Judge Jases refers to the new rule as a “ refinement of the generally accepted rules ”. (25 N Y 2d 196, 209.) While the only section of Restatement, Contracts 2d that was quoted by the court was section 180 (subd. [1], par. [b]), the majority opinion, nevertheless, stated: “ It is quite significant that Restatement 2d, Contracts, states the modern rule on competency to contract.” (25 N Y 2d 196, 204.) A review of the whole rule contained in Restatement, Contracts 2d disclose that it consists of two parts — not one. Section 18C (subd. [1], par. [a.]) omitted in the opinion provides as follows: “ (1) A person incurs only voidable contractual duties by entering into a transaction if by mental illness or *721 defect (a) he is unable to understand in a reasonable manner the nature and consequences of the transaction ’ \ The test recited in paragraph (a), as the review contained in Mental Impairment and Legal Incompetency by Allen, Ferster and Weihofen notes is ‘ ‘ simply a restatement of the traditional understanding test ’ ’ (p. 267). In the Faber v. Sweet Style Mfg. Corp. (40 Misc 2d 212, 216, supra) decision, which first recognized that incompetency to contract might exist in the instance when the contract was entered into under compulsion of mental disease or disorder, the court stated that it existed in that instance “ also ”.
This court finds nothing in the Ortelere decision, nor in any of the authorities cited in .support of that decision that permits the conclusion that compulsion attends every type of mental disease or disorder. As the comment to section ,180 of Restatement, Contracts 2d observes [Restatement, Contracts 2d p. 34] : ‘ * it is now recognized that there is a wide variety of types and degrees of1 incompetency. Among them are congenital deficiencies in intelligence, the mental deterioration of old age, the effects of brain damage caused by accidents or organic disease, and mental illnesses evidenced by such symptoms as delusions, hallucinations, delirium, confusion and depression.”
The court reaches the further conclusion that the additional motivational test announced in the Ortelere decision is one of limited application. It applies only in that instance when there is evidence that even though understanding was complete, the nature of a particular mental disease was such that the capacity of a contracting .party to control his acts was eliminated and he was induced to enter the contract. “ Nothing less serious than medically classified psychosis should suffice ” for the type of mental disease to which the new test applies, and even then it must appear that the other party to the contract had reason to know of the existing mental condition. (See Ortelere v. Teachers Retirement Bd. of City of N. Y., 25 N Y 2d 196, 205, 206.)
The determination made here is that absent the special factual circumstances that give rise to the new motivational test of incompetency announced in Ortelere, the proper judicial approach is to employ the previously determined and long standing cognitive tests. These inquire whether or not the mind of a contracting party was so affected as to render him wholly and absolutely incompetent to comprehend or understand the nature of the transaction and whether or not such contracting party was able to make a rational judgment concerning the particular transaction. (See Aldrich v. Bailey, 132 N. Y. 85, *722 89, supra; Paine v. Aldrich, 133 N. Y. 544, 546, supra, and Restatement, Contracts 2d, § 18C, subd. [1], par. [a].)
In the case for decision, the court finds no evidence that the contract in question was induced by mental disease or that in entering the contract the decedent did so under the compulsion of mental disease. The court finds no evidence that in entering the contract of sale the decedent did so solely as the result of a medically classified psychosis. The court finds no evidence of knowledge on the part of the other contracting party of thé existence of any such medically classified psychosis. Nor is there evidence to support a contention that knowledge of such a psychosis could be imputed to the other contracting party. In summary, from the facts presented, there exists no basis to support a conclusion that the contract of the decedent to sell real property was merely an uncontrolled reaction to mental illness. Accordingly, this court holds that the motivational test of incompetency announced in Ortelere v. Teachers Retirement Bd. of City of N. Y. (25 N Y 2d 196) and recited in section 18G (subd. [1], par. [b]) of Restatement, Contracts 2d has no application.
This court turns then to a consideration of the only other tests of incompetency known to this court to be applicable, viz: the tests of cognition set forth in Restatement 2d, Contracts (§ 18C, subd. [1], par. [a]) and determined in New York in Aldrich v. Bailey (132 N. Y. 85, supra) and Paine v. Aldrich (133 N. Y. 544, supra) and previously recited. Such consideration requires factual review.
In the evening of August 6,1971, the petitioner, John Whitmer, went to the residence of the decedent, John Grebauer. He was driven there by a friend, one Duane Butler. The purpose of Whitmer’s visit was to inquire whether or not Grebauer had any land which he was willing to sell to him. Whitmer \s interest in land acquisition was to make the same available to a sport’s club for the construction of1 a clubhouse and a shooting range. However, any subsequent acquisition of the property by the club would require affirmative approval and vote by the members of the club. The disagreement of the members as to the proper location of a clubhouse, coupled with the strained financial status of the organization rendered any subsequent transfer or sale to the club dubious at best. It was only a hope or an expectancy on the part .of Whitmer. While Whitmer was a member and officer of the sport’s club, it appears clear, and the court finds that he had no authority to act as an agent for the club and was not acting as a purchaser other than for himself.
*723 The initial conversation between "Whitmer and G-ebauer consumed approximately 20 minutes. All that transpired was witnessed by Butler who was present thr oughout.
It appears, without contradiction, that -at the first conference the decedent, Gebauer, advised Whitmer that he did have land for sale; that he was willing to sell approximately 25 acres to Whitmer; that a price was agreed upon and that the terms of the sale were to be incorporated in a written agreement to be prepared by an attorney.
On the following morning, August 7, 1971, Whitmer, again driven in a car by Butler, went to Gebauer’® home. Gebauer was awaiting’ their arrival. The three left for the office of attorney Fred Charles Rider in Ellicottville, New York, for the purpose of having a contract prepared.
At the attorney’s office there followed a conference of approximately one and one-half hour duration. Present throughout were Whitmer, Gebauer, Butler and attorney Rider. A detailed written contract of purchase and sale of1 real property was prepared by attorney Rider. Whitmer as purchaser and Gebauer as seller each read and signed the agreement. The agreement was witnessed. A down payment of $200 was made by check and delivered by Whitmer to Gebauer.
Approximately six days later, the decedent, Gebauer, accompanied by one of his daughters, a Mrs. Keyes, and a son, Curtis Gebauer called at the office of the Federal Land Bank, Olean, New York, for a conference with that bank’s representative, one Herman Cochetto. The conference had been requested by Mrs. Keyes. At the conference the evidence is ‘ ‘ the children did the preliminary talking and expressed concern that their father had entered into a contract to sell and in effect were trying to determine what they might be able to do to get out of it ”. Mr. Cochetto said that he was not in a position to advise how the contract could be voided, but he pointed out that any transfer of land would require a partial release of a mortgage held by the Federal Land. Bank that encumbered the entire farm of which the premises for sale were a part. Wholly unsolicited and conceded by Cochetto to be original with him and volunteered by him, ‘ ‘ in aid of what they were seeking, namely, some means of avoiding the contract ’ ’ Cochetto dictated and delivered a letter advising that a requested partial release of mortgage for the 25 acres under contract of sale was denied and that to obtain a release it would be required that the entire mortgage loan be paid in full.
*724 Leaving the- office of the Federal Land Bank, the decedent’s daughter, his son, and the decedent went to the Village of Franklinville to the office of attorney Jeremiah Moriarty. The discussion there was again principally between the attorney and the decedent’s daughter and son. The testimony of the attorney is that the decedent was tearful and spoke little and that with difficulty. The attorney testified that the decedent did not say anything about the contract and his impression of it. He testified that the decedent had indicated that he did not want to perform the agreement, although he did not say why. The attorney’s impression was that the decedent by nodding his head acquiesced in the views of the son and daughter “ about the background of the site and the fact that he [decedent] didn’t understand what he had done”. The attorney recalled no reference by anyone to the inadequacy of the consideration in the contract. He testified that 11 the big problem” was a discussion that “if this particular part of ground was taken out of the farm it would just destroy its intrinsic value as a farm operation”. As a result of the conversation had with the decedent, the attorney understood that he had been retained by the decedent to represent him.
Acting on his retainer, the following day, attorney Moriarty dictated a letter to attorney Rider as the attorney for the petitioner, John Whitmer. The letter advised “ it would appear that Mr. Gfebauer was not competent to understand the nature of the transaction and therefore the validity of the contract is questionable ’ ’. A photocopy of the letter from the Federal Land Bank and the $200 check made by way of a down payment were enclosed and returned. The letter requested attorney Rider’s comments and advice.
The proof presented was that attorney Rider did not respond to this communication. His testimony was that he was under the impression that in drafting the contract he was representing both the decedent, as seller, and the petitioner, as purchaser. Upon receipt of attorney Moriarty’s letter he testified “ I was definitely surprised that a question had been raised as to the validity of the contract and very definitely surprised that a question was being raised as to his competence ”. Attorney Rider testified that shortly after receipt of the letter he contacted the petitioner and advised him of the receipt of the letter and the return of the check. Asked if he had rendered any bill to anyone for legal services, attorney Rider replied “no”. The reason advanced was “no satisfactory answer, except that I have some reluctance *725 •to render a "bill for the performance of work that seems to have gone sour ”. No further proof1 was made as to the relation of attorney Rider with either the decedent or the petitioner. The petitioner subsequently retained attorney Homer Hutcheson who instituted the present proceeding on his behalf.
The defense of incompetency raised by the respondent rests on the testimony of a physician, one Dr. Ovid Knight. The record will reflect at this point that objections to opinion evidence of incompetency from this general medical practitioner were made. In ruling in the objection note was made by the court that authorities in New York were divided on the question of whether or not only a psychiatrist could testify on the issue of mental competence. The decision of Matter of Lindou (241 App. Div. 819) was noted by the court as holding that only a psychiatrist could give such testimony. The decision there was as follows: ‘ ‘ Dr. Staffer did not qualify as an alienist; therefore, his testimony was erroneously received. He could not legally testify as to the mental competency of the decedent”. (Matter of Lindou, p. 819.)
In contrast, the court noted that in Citarella v. Equitable Life Assur. Co. (59 N. Y. S. 2d 215, 216) it was held that “ the fact that the doctor was not a psychiatrist might go to the weight of his testimony but not to its competency”, and in Travelers Ins. Co. v. Childs (272 F. 2d 855, 857) a decision by Judges Hand, Swan and Lttmbard recited: 61 if the appellants in fact believe, as apparently they do, that a physician who is not a psychiatrist is not competent to give an opinion upon the issue of mental capacity in a federal court, they are clearly mistaken.” Reference was also made by the court to criticism of the exclusionary rule announced in Matter of Lindou (241 App. Div. 819, supra) made in Bender’s New York Evidence (vol. 3, § 101.02, par. 2) and the even more vocal criticism in Wigmore, Evidence (voL 2, § 569). Noting no discovered determination of the Court .of Appeals, or of the Appellate Division, Fourth Department, the court stated that it elected to follow the views of Wigmore and Judge Hand and the Gitarella (supra) decision. The court overruled the objection and permitted the testimony of the general medical practitioner on the issue of competency.
Several arguments intervening, the question ultimately posed to the doctor was: “ Do you have an opinion of his mental competency to enter into a contract and to know what he was doing? ”
*726 The opinion ultimately given by the doctor, additional comments intervening, was: “ It is my .opinion, that from March of 1971 until the time of his death, John G-ebauer was totally incompetent to handle any of his own affairs and any of his personal affairs in terms of even maintaining his own body”.
Upon review there is a substantial question in the mind of the court if the question posed did not, at least in part, call for an opinion not as to mental disease, but as to mental capacity to do an act, which is the issuable fact in the case. (See Wyse v. Wyse, 155 N. Y. 367, 372, and Fingerhut v. Kralyn Enterprises, 71 Misc 2d 846, 857, supra.) Even if it is considered that the question posed and the answer made did not improperly invade the province of the trier of the facts, and represents a medical opinion of incompetency, no appropriate objection having been made, it is, nonetheless, opinion evidence and must be weighed against the other evidence produced.
The testimony of the only completely disinterested witness, Duane Butler, was that the conduct and conversations of the decedent were those ,of a rational person. This was also the opinion of attorney Rider who had known the decedent for several years and who interviewed the decedent for an hour and a half in the preparation of the contract in issue. It was the opinion of Herman Cochetto, representative of the Federal Land Bank, that the decedent appeared rational in his conversation with him during 1970 and 1971 and that in conversations after August 12, 1971, the decedent knew what he was talking about. In April of 1971, the decedent had conducted an auction sale of farm equipment and paid the proceeds of said sale on an outstanding mortgage. Other payments on the mortgage were made in June of 1971. It was also ¡Cochetto’s testimony that the decedent “ had final say as to anything that took place ” on the farm, especially financial matters. This is corroborated by the testimony of Gordon Malin, the cashier of the Cattaraugus County Bank of Little Valley, New York. His testimony was that the decedent continued to carry on active banking transactions in both a checking and savings account until his death. He testified that no one other than the decedent was authorized to draw on those accounts. The detail in the contract which was prepared is also significant. The description of the real property refers to neighboring properties and property lines. It reserved to the decedent a 20-foot right of way for ingress and egress- to other parts of the farm which were not con *727 tracted for sale. The recollection of attorney Rider was that the decedent participated in the discussion concerning the • right of way and also made comments concerning the location of the 25-acre parcel. These comments were “ completely in conformity with the other information being supplied to me ”. The signature of the decedent to the contract is in a bold, firm handwriting that is readily legible. Further, it does not appear that a committee or a conservator was ever appointed for the decedent, or in fact sought. Neither was there any evidence that an attorney in fact was ever appointed. Finally, to reach a conclusion that the decedent was non compos mentis would require, at least impliedly, a determination by this court that attorney Rider lent his legal efforts to prepare and have executed a contract for a client that he knew, or in the exercise of reasonable judgment should have known to be incompetent. Similarly, and impliedly, it would require a determination that attorney Moriarty six days later entered into a contractual relationship of attorney and client with a man who was medically incapable of contracting. The court does not believe and does not find the evidence presented sufficient to warrant a determination of either patent incompetency on the part of the decedent, or knowledge of ineompetency on the part of the attorneys.
What is presented, upon review of all of the evidence, is a picture of a man that in the late autumn of life first experienced physical decline. In 1967 he had suffered a stroke and a vascular disease had resulted in a partial amputation of his foot. He became unable to operate his farm. The attempt of one daughter, a Mrs. Chapman and her husband to purchase and operate the farm had proven unsuccessful. They had departed the farm and another daughter, a Mrs. Keyes had moved into the farmhouse, Mrs.. Keyes did not, however, operate the farm as a farm.
In March of 1971, the decedent’s wife died. This event brought exceptional distress to his life. He was required to move from a trailer that he and his wife had occupied and take up residence with the daughter, Mrs. Keyes, who was living in the farm homestead. Another daughter, Mrs. Chapman, testified, this was a move “he didn’t want to make, he didn’t have any choice and he just lost interest”.
It was in August of 1971 while residing with the daughter, Mrs. Keyes, that the decedent was approached by the petitioner relative to the sale of land. At that time it appears that neither the daughter, Mrs. Keyes, nor anyone else was *728 operating the farm as a farm. The farm equipment had been sold four months earlier. There followed the events which lead to the making of the contract in issue and the objections of one daughter and a son to the proposed sale. The declining health of the decedent continued. He was hospitalized and died on December 13, 1971 at 77 years of age.
The fact and the application of the applicable principles of law to them raised in Bell v. Smith (83 Hun 438), are so similar to those in the case at bar that their recitation is included here. In Bell v. Smith, the court reviewed (p. 442): “ The evidence of the plaintiff’s witness shows that he was-a feeble old man, and undoubtedly he was not as bright or intelligent, nor was his mind as active as in his younger days. But it is not expected that a man of his age will retain his faculties to -their full perfection. The law does not require that to make him competent to do business. A man is perfectly competent to do business if he has a clear appreciation of the particular business in which he is engaged, of the relation it bears to his fortune, of the expediency or inexpediency of it, and if he is able to judge rationally as to the reasonableness of the particular transaction * * * It would be very serious if the law should say that whenever the faculties of a man begin to fail because of his age, it should be reason sufficient for taking from him the. right to control his property. The power of such control is of great use to many old men, to insure to them proper and courteous treatment from their families.”
In Jennings v. Hennessy (26 Misc. 265, 267) it was said: “ The law does not look to age, nor to debility of body, if sufficient intelligence remains.” In Aldrich v. Bailey (132 N. Y. 85, 89), it was said: “A person, we apprehend, may be of old age and mentally weak, and still be able to understand and comprehend the meaning of a deed or the transfer of property. He may have physical infirmities to such an extent as to be unable to transact business personally, and may have to have others act for him, and still he may possess the requisite mind and judgment to transact the business.” In Burns v. O’Rourke (5 Robt. 649) it was said that in mental weakness arising from old age must, it has been said, unless circumstances of fraud or undue influence are added, amount to senile dementia to relieve a person from liability on his contract.
The court reaches the conclusion that at the time of entering into the contract of sale the decedent was enfeebled by age; that there was physical disability and a reduction of *729 mental acumen. However, the court does not reach the conclusion that mental deterioration was to such an extent that the decedent did not comprehend the nature of the transaction of the sale of 25 acres of land to the petitioner. Nor can it be properly concluded that the decedent could not and did not make a rational judgment concerning it. The court makes the positive finding that the decedent was competent to enter into the contract in issue. The court makes the negative finding that the decedent was not at that time non compos mentis.
On the further issues of fraud, overreaching and undue influence, it is noted first, that there is no evidence that the petitioner sought to purchase the particular 25 acres of land which were later contracted for sale. The evidence is that the petitioner initially inquired of the decedent concerning only the purchase of ‘ ‘ some land ’ ’. The details as to the amount and location were ultimately resolved by the decedent.
Further, the purchase price of the land in issue was fixed by the decedent. This was done on the occasion of the first visit of the petitioner to the decedent’s home. The evidence of the disinterested witness, Duane Butler, on this issue is uncontroverted. There was no change or requested change of price during the discussions of contract terms at attorney Eider’s office. Even after the contract was executed no objection to price was made in the conference with the representative of the Federal Land Bank. In the still later conference with attorney Moriarty, price was not an issue. The evidence of that witness contains the following question and answer. “ Was there any reference made to the inadequacy of the consideration in the contract?” The answer given was: “ I don’t recall that ”.
It is clear to the court that it was not the inadequacy of consideration, but the consequences that might follow' from the sale of the 25 acres that caused concern. That concern was whether the farm could be operated as a farm without the 25-acre parcel included therein. That concern appears to have been principally the concern of one of the decedent’s daughters and a son. They were the ones who arranged the conference with the land bank representative and then later the conference with attorney Moriarty. They were the persons who voiced this concern. It was this one daughter and son that were most vocal in objecting to the «ale and most zealous in seeking means of voiding it. As two of five named children of the decedent who would inherit all of the decedent’s prop *730 erty they had a self-serving interest to protect. Note is made that three othei* children of the decedent were disinherited because of prior expenditures of money by the decedent on their behalf.^
The decedent having determined the amount and location of the land and having fixed the price therefor, it is inequitable to charge the petitioner with what the children contend were., improvident determinations made by their father. Our courts have long been zealous in protecting senior citizens from imposition, overreaching or fraud. (See Jackson v. King, 15 Am. Dec. 354.) Equitable intervention by a court should not be interposed, however, to avoid a contract merely because it may be disadvantageous to financially interested third parties. Fraud must be proved not presumed. This court finds no evidence of actual fraud. It finds no evidence that deception was practiced on the decedent. Proof of inadequacy of1 consideration, often a badge of fraud, is absent. In brief, the evidence presented is not of a character to authorize this court to void the contract in issue on the score of fraud, deception or overreaching.
The question of petitioner’s delay in instituting this proceeding until after the death of the decedent is the final equitable consideration which should be weighed. On that issue it is recalled that petitioner’s original attorney had considered himself to be the attorney for the decedent as well. Surprised by the claim of incapacity of the decedent and embarrassed by the consequences of his dual representation of petitioner and decedent, that attorney appears to have notified the petitioner of the assertion and done nothing more. To seek redress the petitioner ultimately was required to seek the services of another attorney. The court thus perceives from the situation presented some explanation of petitioner’s delay.
But what of the delay on the part of the decedent and his personal representative? A claim of incapacity had been asserted. An action for rescission of the contract was at hand. No such action was ever commenced either by the decedent or someone on his behalf. The executor was aware of the petitioner’s contractual claim. He brought an action to have the contract canceled of record. This was an abortive proceeding. The judgment of default there merely removed the contract from the records of the County Clerk. It resolved nothing of the contractual rights of the parties. The plain facts are that the decedent, and later his executor, were content to do nothing until sued. The court finds no adequate *731 grounds for imposing a defense of laches to petitioner’s claim.
The case presented has raised a number of novel points for decision and factual determinations have concededly been difficult. The most impressive item, however, is that the action at bar stands as a monument to the delay, embarrassment and legal complexities which can ensue when an attorney undertakes the dual representation of a purchaser and seller in a real property transaction. (For additional perils, see, Farr v. Newman, 18 A D 2d 64, affd. 14 N Y 2d 183.) This court has long been satisfied that if either party were aware of the hazards and perils of such representation they would never permit it. The court is equally satisfied that if the attorney gave realistic consideration to the same hazards and perils he would never undertake such dual representation. In the instance of dispute, the invariable consequence is that the attorney finds himself contesting the biblical prohibition against serving two masters and ends up emulating Pontius Pilate by desparingly trying to wash his hands of the entire affair. The rights of the parties are not served. The Bar is criticized. Legal process is delayed. The attorney is embarrassed. If the foregoing are insufficient deterrents, there is a more practical consideration — the lawyer is seldom paid by anyone.
The decision is for the petitioner, John L. Whitmer. An appropriate decree requiring the respondent executor of the estate of John A. Grebauer to execute and deliver a deed of the 25 acres of real property described in the contract of sale shall be prepared and presented to the court.